IN THE UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| RICKY WAYNE TUCKER, | : | Chapter 11 |
| | : | Case No. 18-70448-JTL |
| Debtor. | : | (Jointly Administered) |
| | : | |
| IN RE: | : | |
| | : | |
| RICKY CLAY TUCKER, | : | Case No. 18-70449-JTL |
| | : | |
| Debtor. | : | |
| | : | |

**DISCLOSURE STATEMENT FOR**
**JOINT PLAN OF REORGANIZATION OF THE DEBTORS**
**(November 27, 2018)**

David L. Bury, Jr.
Matthew S. Cathey
G. Daniel Taylor
Stone & Baxter, LLP
Suite 800, Fickling & Co. Building
577 Mulberry Street
Macon, Georgia 31201
Counsel to Debtors and Debtors-in-Possession

# TABLE OF CONTENTS

**Page**

I.      Introduction ................................................................................................3

      A.      The Disclosure Statement ....................................................4
      B.      Bankruptcy Court Approval of this Disclosure Statement ...................4

II.     Voting Procedures and Requirements.................................................................4

      A.      Eligibility to Vote .................................................................4
      B.      Ballots and Voting Deadlines ....................................................5
      C.      Confirmation Hearing ..............................................................7
      D.      Recommendation ...................................................................7

III.    The Tuckers; Tucker Farms ..........................................................................7

      A.      History of the Farm................................................................7
      B.      Description of the Debtors' Operations .........................................8
      C.      Overview of Assets and Liabilities...............................................9
      D.      Events Precipitating the Chapter 11 Filings....................................12

IV.     The Tuckers' Chapter 11 Cases ....................................................................13

      A.      Significant "First Day" Bankruptcy Orders....................................13
      B.      Significant Events During the Chapter 11 Cases...............................14
      C.      Pre-Petition Claims ..............................................................17
      D.      Summary of Debtors' Business Since the Petition Date......................17
      E.      Post-petition Financial Results ..................................................18

V.      Summary of the Plan...................................................................................18

      A.      Introduction.........................................................................18
      B.      Unclassified Claims ..............................................................31
      C.      Classification and Treatment of Claims and Interests .......................33
      D.      Means of Implementation of the Plan...........................................33
      E.      Provisions Governing Payment and Distributions.............................36
      F.      Provisions Governing Objections to Claims....................................39
      G.      Provisions Regarding Effects of Confirmation.................................40
      H.      Retention of Jurisdiction .........................................................45
      I.      Miscellaneous Plan Provisions .................................................45

VI.     Financial Information..................................................................................46
VII.    Acceptance and Confirmation.......................................................................47

A.    Acceptance of the Plan.........................................................................47
B.    Feasibility...........................................................................................47
C.    "Best Interests of Creditors" Test ......................................................47

VIII.  Feasibility of the Plan .....................................................................................49

IX.   Certain Tax Consequences...............................................................................50

A.    In General...........................................................................................50
B.    Gain or Loss on Exchange .................................................................50

X.    Alternatives to Confirmation and Consummation of Plan...............................52

A.    Liquidation Under Chapter 7 .............................................................52
B.    Alternative Plan of Reorganization....................................................52

XI.   Solicitation ......................................................................................................52

IN THE UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| RICKY WAYNE TUCKER, | : | Chapter 11 |
| | : | Case No. 18-70448-JTL |
| Debtor. | : | (Jointly Administered) |
| | : | |
| IN RE: | : | |
| | : | |
| RICKY CLAY TUCKER, | : | Case No. 18-70449-JTL |
| | : | |
| Debtor. | : | |
| | : | |

**DISCLOSURE STATEMENT FOR**
**JOINT PLAN OF REORGANIZATION OF THE TUCKER DEBTORS**
**(November 26, 2018)**

**NOTICE**

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") HAS BEEN AUTHORIZED BY THE COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING OR REJECTING THE JOINT PLAN OF REORGANIZATION OF THE TUCKER DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, DATED NOVERMBER 27, 2018 (AS IT MAY BE FURTHER AMENDED, THE "PLAN"), A COPY OF WHICH PLAN YOU ARE BEING SERVED HEREWITH.  NO REPRESENTATIONS HAVE BEEN AUTHORIZED BY THE COURT CONCERNING THE DEBTORS OR THE PLAN, EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN, AND IS NOT INTENDED TO REPLACE CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN, BUT TO AID AND SUPPLEMENT SUCH REVIEW. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN.  **ALL CAPITALIZED TERMS CONTAINED IN THIS DISCLOSURE STATEMENT HAVE THE MEANING ASSIGNED IN THE ACCOMPANYING PLAN.  IN THE EVENT OF A CONFLICT BETWEEN THE PLAN AND DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN WILL GOVERN.**  ALL HOLDERS OF CLAIMS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, EVENTS IN THE TUCKERS' CHAPTER 11 CASES, AND FINANCIAL INFORMATION. ALTHOUGH THE TUCKERS BELIEVE THAT THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE TUCKERS, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE TUCKERS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT INACCURACY OR OMISSION.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, EXCEPT TO THE EXTENT AN EARLIER DATE IS SPECIFIED WITH RESPECT TO ANY INFORMATION, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF OR THEREOF.

NO PERSON WILL CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH PERSON SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL OR TAX ADVISORS AS TO ANY SUCH MATTERS.

THE DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION PASSED UPON OR IS THE SECURITIES AND EXCHANGE COMMISSION REQUIRED TO PASS UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A FINDING BY THE COURT THAT THE REPRESENTATIONS CONTAINED HEREIN ARE FACTUAL, NOR DOES SUCH APPROVAL CONSTITUTE AN ENDORSEMENT OF ANY OF THE REPRESENTATIONS CONTAINED IN EITHER THIS DISCLOSURE STATEMENT OR IN THE ATTACHED PLAN.  THE PLAN WILL NOT BE BINDING ON CREDITORS UNLESS IT IS CONFIRMED BY THE BANKRUPTCY COURT AT THE CONFIRMATION HEARING TO BE HELD ON _____, IN THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF GEORGIA, 901 FRONT AVENUE, ONE ARSENAL PLACE, COLUMBUS, GEORGIA.

I.   **INTRODUCTION**

On April 19, 2018, Ricky Wayne Tucker ("Ricky Tucker") filed his voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.  On that same day, Ricky Clay Tucker ("Clay Tucker", collectively with Ricky Tucker, the "Tuckers" or "Debtors"), also filed his voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. On May 18, 2018, the Court entered an order granting the joint administration of the Cases.

The above-captioned bankruptcy cases are sometimes collectively referred to in this Disclosure Statement as the "Case" or the "Cases."  This Disclosure Statement provides a history of the Tucker farming and other businesses, a summary of the financial condition, the reasons for filing the Cases, key developments during the Cases, and an explanation of the Tuckers' Plan.

The Tuckers submit this Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code in connection with the solicitation of acceptances of their Joint Plan of Reorganization dated November 27, 2018 (the "Plan"), a copy of which is attached hereto as **Exhibit "A"**. In summary, the Tuckers seek to continue operation of their business and pay Allowed Claims as provided herein.  Specifically, the Tuckers propose to pay (i) all Allowed Secured Claims in full, through the surrender of collateral on the Effective date and/or through monthly payments with interest over time and (ii) Allowed Unsecured Claims, including Deficiency Claims, as is possible given their restructured cash flows from operations.

As more particularly described in the Plan and this Disclosure Statement, the Tuckers desire, and propose through this Plan, to transfer title to some of their assets to lenders on the Effective Date in satisfaction of their secured claims collateralized by such property and to transfer substantially all of their remaining farm-related assets that they own jointly or severally in their individual names, and which the Tucker Farms joint venture currently operates, to Tucker Family Farms, LLC ("TFF"), an existing Georgia limited liability company that is wholly owned by the Tuckers on the Effective Date pursuant to the Plan.  All assets transferred to TFF will be transferred subject to existing liens.  The ownership of TFF will be held by the individual Debtors and amended to reflect ownership in the same overall percentages of interests as the individual Debtors hold in the properties being transferred to TFF.

Notwithstanding the transfer of the farm assets to TFF, until all payments due under this Plan have been made and the Tuckers have been discharged, (i) the Tuckers will remain personally liable on their respective debts, both business and personal and (ii) liens securing the payment of Allowed Secured Claim will remain intact.  TFF will make all Plan Distributions on behalf of the Tuckers.

The Tuckers believe that this proposed change in ownership and centralized management structure would merely formalize their already-integrated farming enterprise and be in their, their Estates', and their creditors' best interests for purposes of credit risk, general liability and risk management, tax planning, and estate and succession planning.

The projected income and expenses of the Debtors (through TFF) are shown on **Exhibit D**, attached to this Disclosure Statement.  Funds required for implementation of the Plan and distributions under the Plan shall be provided from the Debtors' regular farming operation as

projected in the Budget. Debtors believe that confirmation of the Plan will be more economical and efficient than a liquidation under Chapter 7 of the Bankruptcy Code because of, among other things, the highly-discounted value that would be obtained for Debtors' assets if they were sold in a quick sale by a Chapter 7 trustee and the increased costs and expenses of a liquidation under Chapter 7 which would result in creditors not being paid in full and the elimination of Debtors' life's work.

Debtors believe that their Plan is feasible and that its Confirmation (approval) by the Bankruptcy Court is in the best interests of all Parties-in-Interest. Therefore, Debtors urge acceptance of the Plan.

### A.     The Disclosure Statement.

The purpose of this Disclosure Statement is to set forth information that (i) outlines the history of the Tuckers, their business, and the reasons the Tuckers were forced to file the Cases, (ii) summarizes the Plan, and (iii) is intended to assist each holder of any Claim against the Tuckers entitled to vote for acceptance or rejection of the Plan to make an informed decision of whether to vote to accept or reject the Plan. No solicitation for votes on the Plan may be made except pursuant to this Disclosure Statement, and no person has been authorized to utilize any other information concerning the Tuckers or their businesses for such purpose.

This Disclosure Statement does not purport to be a complete description of the Plan, the financial status of the Tuckers, the applicable provisions of the Bankruptcy Code, or of other matters that may be deemed significant by Creditors, interest holders, or other parties in interest. The Disclosure Statement necessarily involves a series of compromises between extensive "raw data" and the legal language in documents or statutes on the one hand, and considerations of readability and usefulness on the other. For further information, you should examine the Plan directly and consult your legal, financial, and tax advisors.

### B.     Bankruptcy Court Approval of this Disclosure Statement.

After notice and a hearing, the Bankruptcy Court approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable each holder of a Claim against the Tuckers to make an informed judgment as to whether to vote to accept or reject the Plan.

## II.  VOTING PROCEDURES AND REQUIREMENTS

### A.     Eligibility to Vote

The Tuckers are soliciting acceptances of the Plan from each Class of Creditors identified in the Plan as an impaired class that is not deemed to have rejected the Plan. "Unclassified Claims," identified below, are unimpaired, and are therefore deemed to have accepted the Plan. Such parties will not vote. Each Class of Creditors or interest holders that will not receive any distribution under the Plan is deemed under Section 1126(g) of the Bankruptcy Code to have rejected the Plan. The Tuckers will not solicit acceptances from those Creditors or interest holders.

Specifically, only the holders of Allowed Claims in those classes specified below and further specified in the Plan (the "Voting Classes") are eligible to vote to accept or reject the Plan.

This Disclosure Statement and the accompanying Plan are being sent to all holders of Unclassified Claims, Creditors, and Interest holders, whether or not entitled to vote. Under Section 1141 of the Bankruptcy Code, the Plan, if approved ("confirmed") by the Bankruptcy Court, will bind all parties, whether or not such parties are entitled to vote for or against the Plan.

### B.    Ballots and Voting Deadlines.

#### 1.    Ballots.

Holders of Claims entitled to vote on the Plan will receive a Ballot accompanying this Disclosure Statement. All votes to accept or reject the Plan must be cast by using the Ballot enclosed with this Disclosure Statement (or manually executed copies thereof). No other votes will be counted.

Please fill out the Ballot and return it to the Bankruptcy Court at the address listed below:

> Clerk, United States Bankruptcy Court
> Middle District of Georgia
> P.O. Box 2147
> Columbus, Georgia 31902

DO NOT RETURN ANY SECURITIES, NOTES, OR PROOFS OF CLAIM WITH YOUR BALLOT. The amount of your Claim for purposes of voting will be the amount shown upon any Proof of Claim filed by you in connection with the Bankruptcy Cases, or if you did not file a Proof of Claim, by the amount shown as being owed on the Schedules of Assets and Liabilities filed by the Debtors in their respective, individual Bankruptcy Cases. If an objection to a Claim is filed before Confirmation of the Plan, then the amount of the Claim for voting purposes will be determined by the Court.

If delivery is by mail, enough time should be allowed to ensure timely delivery to and actual receipt by the Bankruptcy Court by the Voting Deadline.

**AS PROVIDED IN THE ATTACHED ORDER OF THE BANKRUPTCY COURT APPROVING THE FORM AND CONTENT OF THIS DISCLOSURE STATEMENT, (THE "CONFIRMATION PROCEDURES ORDER") IN ORDER TO BE COUNTED, BALLOTS MUST BE COMPLETED, SIGNED AND ACTUALLY RECEIVED IN PROPER FORM BY THE BANKRUPTCY COURT AT THE ABOVE ADDRESS ON OR BEFORE 12:00 MIDNIGHT (EASTERN TIME) ON THE DATE STATED IN THE CONFIRMATION PROCEDURES ORDER (THE "VOTING DEADLINE"), OR SUCH LATER DATE TO WHICH THIS SOLICITATION IS EXTENDED BY THE DEBOTRS OR THE COURT. BALLOTS RECEIVED AFTER THIS TIME MAY NOT BE COUNTED IN THE VOTING UNLESS THE COURT SO ORDERS. IF YOU HAVE**

**ANY QUESTIONS ABOUT PROCEDURES FOR VOTING, OR IF YOU DID NOT RECEIVE A BALLOT, RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR HAVE ANY QUESTIONS ABOUT THE PLAN OR DISCLOSURE STATEMENT, PLEASE CALL COUNSEL FOR THE DEBTORS AS SET FORTH ON THE COVER PAGE OF THIS DOCUMENT.**

If a Ballot is signed by trustees, executors, administrators, guardians, attorneys, officers of corporations or others acting in a fiduciary or representative capacity, such persons should indicate their authority in the space provided on the Ballot.

1.      Revocation of Ballots.

As provided by Federal Rule of Bankruptcy Procedure 3018(a), for cause shown, the Court, after notice and a hearing, may permit a creditor or equity security holder to change or withdraw an acceptance or rejection of the Plan, or may temporarily allow the claim or interest for purposes of voting, notwithstanding an objection to such claim or interest.

2.      Voting Multiple Claims.

Persons holding Claims in more than one Class will vote such Claims in each Class.

3.      Incomplete Ballots.

Any Ballot received which is unsigned or does not indicate either an acceptance or a rejection of the Plan will not be counted.  Incomplete ballots may be amended by the holder of the Claim on account of which the Ballot is cast to cure the deficiency, provided the amendment is filed before the beginning of the hearing on confirmation of the Plan.

4.      Waivers of Defects, Irregularities, Etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Bankruptcy Court, which determination will be final and binding.  The Tuckers reserve the right to contest the validity of any revocation or withdrawal. The Tuckers also reserve the right to request the Bankruptcy Court to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Tuckers or their counsel, be unlawful. The Tuckers further reserve the right to request the Bankruptcy Court to waive any defects or irregularities or conditions of delivery as to any particular Ballot.  The Bankruptcy Court's interpretation (including its interpretation of the Ballot and the respective instructions thereto), unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Bankruptcy Court determines.  Neither the Tuckers nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  The Tuckers will provide copies of any contested Ballots to the Committee and to the United States Trustee contemporaneously with the filing of the Balloting Report with the Court.

### C.    Confirmation Hearing.

The Confirmation Hearing will be held at a time and place as provided in the Confirmation Procedures Order. Such Confirmation Hearing, held pursuant to section 1128 of the Bankruptcy Code, may be adjourned from time to time by additional notice prior the hearing or by announcement in Bankruptcy Court on the scheduled date of such hearing.  At the Confirmation Hearing, the Bankruptcy Court will (i) determine whether the requisite votes have been obtained for the Voting Classes, (ii) hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously disposed of, and (iii) determine whether to confirm the Plan.

In the Confirmation Procedures Order, attached hereto, the Bankruptcy Court has directed that all objections, if any, to confirmation of the Plan must be filed with the Bankruptcy Court and served in a manner and by a deadline set in that Order, with service of objection on:: (i) counsel to the Tuckers, David L. Bury, Jr. and G. Daniel Taylor, Stone & Baxter, LLP, Suite 800, Fickling and Co. Building, 577 Mulberry Street, Macon, Georgia 31201-8256 (fax number 478-750-9899) and (ii) the Office of the United States Trustee, Middle District of Georgia, Attn: Elizabeth Hardy, 440 Martin Luther King Jr. Blvd., Suite 302, Macon, Georgia  31201.

Objections to Confirmation of the Plan may be filed by any Creditor or party in interest, regardless of whether such Creditor or party in interest is entitled to vote on the Plan.

### D.    Recommendation.

***The Tuckers believe the that the Plan provides the best and most efficient approach to the payment of Claims in these Cases, through the continuing operation of the Tuckers' farming business, and maximizes the value of the Tuckers' Assets for the benefit of their Creditors and other interest holders. The Tuckers also believe that the Plan provides for the payments to holders Allowed Claims in excess of what would be paid to such Holders in a liquidation in a Chapter 7 bankruptcy case. Therefore, the Tuckers urge Creditors to vote to <u>ACCEPT</u> the Plan.***

## III.    <u>The Tuckers; Tucker Farms</u>

### A.    History of the Farm

The Tucker family began their farming operations in Enigma, Georgia in the late 1970s. Ricky Tucker is the founder of the farm and began operating the farm on rented land in 1977 following his graduation from high school. Throughout the 1980s and 1990s, Ricky Tucker grew the farm through both the purchase and lease of additional land, and the purchase of equipment. Substantially all of the farms profits were poured into the expansion of the farm. In 1996, Clay Tucker joined his dad on the farm. Together, the two have operated under the trade name "Tucker Farms."

From humble beginnings, the Tuckers have expanded the farming operation into a sophisticated, integrated, and diversified business.  Currently, the farm spans roughly 2,500 acres (1,600 owned and approximately 900 leased) in both Tift and Berrien County. Although the

Tuckers have grown a number of different crops over the years, the Tuckers current crops are centered on watermelons, cotton, and peanuts. Additionally, the Tuckers also manage a sizeable beef cattle heard and Clay Tucker owns and operates a large chicken farm operation.

As with most family farms, during the harvest season it's all hands on deck, with various family members chipping in to ensure a successful harvest. Almost all of the family's resources are devoted to ensuring the continued operation of this more than 40 year old farm. Despite its size, the Tuckers' farm is truly a family business. In this era of rising costs and declining family farms, the Tuckers seek to continue their farming tradition and pay their creditors through the implementation of the Plan.

### B.    Description of the Debtors' Operations

At the time of filing these Cases, the Tuckers grew a variety of crops, of which watermelons were the largest.  The other primary crops included cotton, peanuts, and leafy greens—kale, mustards, and collards. Additionally, in the three years leading up to the bankruptcy filing, the Tuckers also grew a significant amount of tobacco, yellow squash, bell peppers, and corn.  Since the filing of the Cases, the Tuckers have modified their crops and chosen focus on watermelons (grown through their affiliate, TFF), cotton, and peanuts.

Watermelons are planted in the early spring and harvested in late summer. Cotton and peanuts are planted in the late spring and harvested in the fall.

The business cycle for the Tuckers is annual, as opposed to monthly or quarterly.  The cycle for watermelons begins with preparation of farm fields and the planting of crops in January and February, with plantings beginning in early March and continuing through April. Unlike the Tuckers' row crops (cotton and peanuts), the watermelons are first planted in greenhouses located at the Tucker farm headquarters in Enigma, Georgia. Once the juvenile plants reach 30 to 40 days old, they are then placed in the field. The watermelons are grown using an "irrigation under plastic" technique, which means underground irrigation is installed under plastic covered field rows. Although more cost intensive on the front-end, the technique is used in order to reduce irrigation, chemical, and fertilizer costs, by ensuring an efficient and cost effective delivery method (the underground irrigation). Additionally, the plastic coverings work to greatly reduce product loss based on weed, parasite, fungus, and insect growth. Like most produce and fruit crops, there is a significant working capital requirement during the planting and harvest periods.  Significant proceeds from the sale of watermelons begin to flow back to the farm in late July and continue through mid-September.  All proceeds from watermelon sales are typically collected by the end of September of each year.

Cotton is planted in April and May and harvested in October through December.  A portion of the crop may be sold under contract while the remainder is sold on the spot market. Proceeds from cotton sales are generally collected by the end of December or early January of the following year.

Peanuts are typically planted in April and May, and harvested in September through November. Proceeds from peanut sales are collected by the end of December each year. Unlike

they do with cotton, the Tuckers may elect to place their peanuts in a federal government sponsored "loan program." The purpose of the loan program is to allow the Tuckers to hedge the risk associated with peanut market price fluctuations. Unlike cotton and peanuts, watermelons—like most fruit and produce crops—currently are uninsurable.  Thus, there is significant farming risk from hail, heat, pests, and lack of water.

The Tuckers also own and operate a cold storage packing house located in Tifton, Georgia, which is the site of the former Georgia Vegetable Company processing plant. The Tuckers purchased the Tifton Plant in 2015, for the purpose of processing and storing watermelon and produce varieties that required immediate cooling after harvest. The Tuckers have also used the Tifton Plant in the past to process and store various types of produce grown by the Tuckers and other farmers. As part of their reorganization and as further described in this Disclosure Statement and in the Plan, the Tuckers intend to liquidate the Tifton Plant. Thus, the watermelon operation will focus only on those varieties of melons that are not required to be cooled immediately after harvest.

In addition to the crop farming described above, Clay Tucker also owns and operates a pullet chicken farming operation. A "pullet farm" is the least common type of chicken farm. This farm produces pullets and roosters, which are intended to be delivered to a breeder hen house at 20-22 weeks old when they are sexually mature to breed and lay eggs. Income from the chicken operation is, for the most part, received on a monthly basis. Under his current long-term contract with Sanderson Farms, Inc., Clay is paid on a per square foot basis for each month in which chickens are on site in the houses. The houses typically have chickens 10 months a year. Like with the Tifton Plant, Clay Tucker intends to liquidate the Chicken Houses.

Working capital requirements in excess of that which is generated from farming operations has been provided by a farm supply company under a debtor-in-possession financing arrangement secured by proceeds from the peanut and cotton crop that has been approved by the Bankruptcy Court and by various crop advances relating to the watermelon crops that are repaid from the proceeds from the sales of the watermelons.

On the Petition Date, the Tuckers had approximately 14 full time employees.  Since the Petition Date, the Tuckers have reduced this number to 6 full time employees. During the 2018 Crop Year, the Tuckers utilized up to 100 seasonal workers. These workers were procured through a labor arrangement with Melon One, LLC, the Tuckers 2018 watermelon broker, some of which included workers brought in under the H-2-A program.  The seasonal employees may be supplemented from time to time with contract laborers. Labor shortages can be a severe problem in operating the farm, causing the inability to harvest and pack crops when they are ready.  The Tuckers are taking steps to assure adequate seasonal labor in 2019 and future years.

C.      **Overview Of Assets And Liabilities**

The Debtors' assets can be generally classified into two categories: (1) farm assets and liabilities; and (2) their personal household assets and liabilities.

    i.   **Assets – Household**

    a.  <u>Ricky Tucker</u>

Ricky Tucker scheduled household assets with an estimated value on the Petition Date of $224,429.00. His household assets consist primarily of (i) his personal residence (owned jointly with his wife) with an estimated value of $150,000.00 and (ii) household goods with an estimated value of $73,929.35 (which includes life insurance policies with an estimated cash surrender value on the Petition Date of $55,706.85). He also scheduled an interest in Tucker Family Estate, LLC, an entity unrelated to Tucker Farms, Tucker Family Farms, LLC, or these cases. Tucker Family Estate has an estimated value of $0, He claimed total exemptions of $21,500.

    b.  <u>Clay Tucker</u>

Clay Tucker scheduled household assets with an estimated value on the Petition Date of $227,992.99. His household assets consist primarily of (i) his personal residence (owned jointly with his wife) with an estimated value of $200,000.00 and (ii) household goods with an estimated value of $27,492.99 (which includes life insurance policies with an estimated cash surrender value on the Petition Date of $16,301.49). He claimed total exemptions of $31,500.00.

    ii.   **Liabilities – Household**

    a.  <u>Ricky Tucker</u>

Ricky Tucker scheduled the following household liabilities: (i) miscellaneous credit card debt of $29,348.00, (ii) personal vehicle debt to Robins Financial Credit Union of $14,896.00, and (iii) miscellaneous monthly utility bills and a limited number of personal medical expenses. In the aggregate, Ricky Tucker's household liabilities are approximately $65,000 as of the Petition Date.

    b.  <u>Clay Tucker</u>

Clay Tucker scheduled the following household liabilities: (i) a first mortgage on his personal residence (owned jointly with his wife) to Wells Fargo Bank in the amount of approximately $158,000; (ii) miscellaneous credit card debt of $11,926, (iii) personal vehicle debt to Wells Fargo Dealer Services of $54,000, and (iv) miscellaneous monthly utility bills and a limited number of personal medical expenses. In the aggregate, Clay Tucker's household liabilities are approximately $223,926.00 as of the Petition Date.

    iii.   **Assets – Farm**

The Debtors' combined farm assets consist of farm equipment, land and buildings which include the Tifton Plant, greenhouses, storage buildings, cash, accounts receivable and Bankruptcy Causes of Action. The Debtors also have varying quantities of growng crops in the ground. It is doubtful that these crops would have any value in a liquidation, and no value has

10

been attributed to them because it is doubtful that they could be harvested and sold. The combined aggregate market value of Debtors' farming assets described above is approximately $10,607,300. The Debtors' determination of the combined aggregate value is further discussed below.

The Debtors' farm assets can be further classified into three (3) sub-categories: (1) real property; (2) equipment and vehicles; and (3) other assets.

### a. Real Property

The Debtors estimate that the value of their farm related real property is $7,520,500.00, as of December 31, 2018. That value is derived from two sources. First, Debtors obtained an appraisal from Crumley & Associates, Inc. ("Debtors' Appraisal") concerning the value of Debtors' farm land. For Debtors' Tifton Plant and Chicken Houses, the Debtors' value is derived from an appraisal prepared by Almond & Co., LLC, on behalf of Synovus Bank (the "Synovus Real Preoprty Appraisal"). The Debtors' Appraisal and the Synovus Appraisal are quite voluminous. Therefore, the Debtors have prepared a summary of such appraisals, which is attached hereto as Exhibit "B-1" (the "Real Property Value Summary").

### b. Equipment

The Debtors estimate that the value of their farm related personal property, such as equipment and vehicles, is 1,776,800, as of December 31, 2018. That value is derived from a combination of Debtors' personal estimate of value and an appraisal prepared by Paulet, Rios, & Associates for Synovus Bank (the "Synovus Equipment Appraisal"). Like the Debtors' Appraisal and the Synovus Real Property Appraisal, the Synovus Equipment Appraisal is detailed and voluminous. Therefore, the Debtors have prepared a summary, which is attached hereto as Exhibit "B-2" (the "Equipment Value Summary").

### c. Other Farm Assets

The Debtors' farm assets, other than real property, equipment, and vehicles, include, without limitation, cash on hand, accounts recievable, insurance claims, and farm supplies on hand. The Debtors estimate that, as of December 31, 2018, they will have $150,000 in cash, accounts receivable of $100,000, approximately $25,000 in insurance claims, and $2,500 in farm supplies on hand. It is important to note that the farm has wide seasonal swings, and cash and receivable balances could vary widely from the estimated balances at December 31, 2018 depending on the time of year. With the exception of certain insurance claims, Debtors' Other Farm Assets are otherwise unencumbered.

### iv.    Liabilities – Farm

With the exception of certain vehicles, the cash, accounts receivable, and farm supplies on hand, substantially all of Debtors' farm assets have liens against.. The liquidation analysis attached hereto as **Exhibit F** indicates the secured claims asserted against Debtors' assets and the allocations of Debtors' assets to those Secured  Creditors' Claims in accordance with the priority

of their respective liens.  After adjustments to reduce market values to estimated liquidation quick sale values, the liquidation analysis shows very minor surpluses and even some substantial deficiencies.

After further deducting trustee fees, costs of liquidation, legal fees and other Administrative Claims, the analysis shows that there is $166,032.35 in net unencumbered assets available for distribution to unsecured creditors.

As of December 31, 2018, the Debtors estimate the following liabilities on their combined books: (1) pre-petition unsecured general trade debt of approximately $1,584,352.92; (2) pre-petition Secured Claims totaling approximately $10,553,416.91; and (3) pre-petition state and federal tax claims of $122,088.02.

### D.      Events Precipitating the Chapter 11 Filings.

The Tuckers' farming operation grew steadily beginning in 1977. By 2012, the Tuckers' farm had become one of the largest tobacco growers in the state. However, given the increasingly depressed market for tobacco caused by increasing government regulation, the Tuckers chose to transition out of the tobacco market. Thus, between 2012 and 2015, the Tuckers began experimenting with various replacement crops, such as squash, greens (kale, mustard, collards), and bell peppers. In 2015, the Tuckers suffered a significant loss to their tobacco crop caused by summer storms. Therefore, the Tuckers made the decision to fully transition out of tobacco beginning with the 2016 crop year. In 2016, the Tuckers entered into an agreement with Tarbett Farms, Inc. to grow various types of peppers, with a particular focus on bell peppers. During the 2016 crop year, the Tuckers' estimate that they lost nearly $3,000,000.00 and they attribute substantially all of those losses to the pepper crop, which was caused by severely depressed market prices. As a result of those losses, substantially all of the Tuckers' liquidity and working capital was drained from the farming operation. Due to the severe losses suffered in 2016, Synovus Bank, the Tuckers primary secured lender, although willing to work with Tuckers to restructure their debt, declined to provide a 2017 crop loan. Accordingly, the Tuckers sought additional funding sources to fund the working capital needs of the farm. By the beginning of 2018, the Tuckers had exhausted their working capital and were unable to secure additional financing.

In March of 2018, the Debtors engaged Stone & Baxter, LLP to assess their options and assist with restructuring the farm.  During the first several weeks of Stone & Baxter's engagement, the Debtors:

- Terminated any payment plans that had been negotiated with certain trade creditors;
- Ceased all non-critical disbursements to rebuild the farms' cash balance.
- Secured financing for the 2018 watermelon crop from Melon One, LLC, through the use of Tucker Family Farms, LLC;
- Secured financing for the 2018 peanut and cotton crop from Dixon Farm Supply, Inc.;

- Began a process of open communication with both secured and unsecured creditors regarding the Tuckers' precarious financial condition;
- Created a detailed cash forecast for the balance of the year to be used in managing cash and monitoring performance going forward; and
- Began discussions with both secured and unsecured creditors with respect to an out-of-court workout and debt restructuring.

After securing financing for the 2018 crop year, it was hoped that the Tuckers would be able to do an out-of-court settlement with their unsecured creditors and restructure their secured debt. However, despite the best efforts of the Tuckers and their primary secured creditor, restructuring that portion of the secured debt on a consensual basis became doubtful at best.

As a consequence, and as the pressure from its unsecured creditors mounted, the Tuckers elected to file their Bankruptcy Cases on April 19, 2018.

## IV.   THE TUCKERS' CHAPTER 11 CASES

The Tuckers' bankruptcy cases are reorganization cases under Chapter 11 of Title 11, United States Code. The Tuckers have continued to operate their business and manage their farming operations as Debtors and Debtors-in-possession as authorized under Sections 1107(a) and 1108 of the Bankruptcy Code. Significant developments during the Tuckers' Chapter 11 Case are described below.

### A.   Significant "First Day" Bankruptcy Orders.

At the outset of the Chapter 11 Cases, the Debtors filed motions with the Bankruptcy Court seeking both procedural and substantive relief. Those motions are described below.

#### 1.   Retention of Professionals; Compensation Procedures.

The Debtors obtained approval from the Court for the retention of the following professionals pursuant to Section 327 of the Bankruptcy Code (the "Professionals"):

- Stone & Baxter, LLP, as counsel for the Debtors;

On May 18, 2018, the Court entered an order granting the employment of Stone & Baxter, LLP, as counsel for the Debtors, and establishing compensation procedures for the Debtors' Professionals whereby the fees and expenses of the Debtors' professionals could be provisionally paid on a monthly basis, subject to objection by Creditors and final approval by the Bankruptcy Court.

#### 2.   Joint Administration.

On April 23, 2018, the Debtors filed their motions to have their Bankruptcy Cases jointly-administered pursuant to Bankruptcy Rule 1015(b). (Dkt. 14, Case No. 18-70449). As affiliated entities and persons with two separate bankruptcy petitions pending, Debtors believed

that consolidating their Cases procedurally would save considerable time and expense by avoiding the unnecessary time and expense of duplicative motions, applications, orders, and other pleadings.  The Bankruptcy Court ordered the Bankruptcy Cases jointly administered on May 15, 2018 (Dkt. No. 43).

3.    <u>Post-Petition Financing</u>.

On May 1, 2018 the Debtors filed their motions to obtain post-petition debtor-in-possession ("<u>DIP</u>") financing from Dixon Farm Supply, Inc. ("<u>Dixon</u>"), a seed, chemicals, and fertilizer supplier, to fund the purchase of their  peanut and cotton crop and harvest expenses. The financing, which was approved on an interim basis by Order of the Bankruptcy Court dated May 10, 2018, and on a final basis on May 18, 2018 (Dkt. No. 25, as Amended at Dkt. No. 27), and provided for financing of up to $750,000.  The financing agreement allowed the Tuckers to use the products purchased from Dixon for their peanut and cotton crop, and also allowed the Tuckers to receive cash advances from the Dixons for farm related expenses. The DIP loan was secured by the Tuckers' cotton and peanut crop, and was to be repaid from proceeds from the sale of the cotton and peanut crop, with interest payable at 12% per annum. To date, the Debtors estimate that they have used aproxaimtely $650,000 from the DIP loan and anticipate all loans received from Dixon will be repaid on or before December 31, 2018.

The Tuckers intend to enter into another financing arrangement with Dixon for its 2019 crops, the terms of which are expected to be similar to the agreement described above

**B.    Significant Events During the Chapter 11 Cases**

1.    <u>Filing of Schedules and Statements of Financial Affairs</u>

The Tuckers filed their respective Schedules of Assets and Liabilities (the "<u>Schedules</u>"), within the time prescribed by the Bankruptcy Rules and the Bankruptcy Court.  The Schedules are of record in the office of the Clerk of the Bankruptcy Court and are available for inspection at the Clerk's Office and online through the Court's website.

The Schedules, filed under oath, list all known respective assets and liabilities of the Tuckers as of the respective Petition Dates.  The manner in which Claims against the Debtors are listed in the Schedules is important.  Under Section 1111(a) of the Bankruptcy Code, a Proof of Claim or interest is deemed "filed" for any claim or interest that appears in the Schedules, except a claim or interest that is scheduled as disputed, contingent, or unliquidated.  Parties satisfied with the manner in which their claim or interest is listed in the Schedules need not file a Proof of Claim in the Bankruptcy Case, but if there is disagreement with the amount so scheduled, unless a Proof of Claim is filed, the amount of the claim or interest shown in the Schedules establishes the amount of the claim or interest for all purposes in the Bankruptcy Case.  A Proof of Claim filed in the Case automatically supersedes the Schedules, unless objected to by the Debtors, the Reorganized Debtors under the Plan (the Plan provides that the Debtors and the Reorganized Debtors will have 120 days following the Effective Date within which to object to Proofs of Claim or Claims that are deemed filed under section 1111(a), or within 90 days after the Filing of such Proof of Claims, whichever is later.)  Creditors have the burden of checking the Debtors' Schedules to determine if their Claims are accurately scheduled.

14

2. <u>Meetings of Creditors</u>

On June 20, 2018, the Tuckers attended the 341 Meeting of Creditors

3. <u>No Committee of Unsecured Creditors Appointed</u>

No creditor committee has been apointed the Bankruptcy Cases.

4. <u>Cash Collateral</u>

On July 30, 2018 Synovus Bank[1], the Debtors' primary secured lender, filed a Motion to Prohibit Use of Cash Collateral, asserting an interest in the proceeds generated by Clay Tucker's Chicken Houses. Synovus and Clay Tucker entered into a consensual agreement resolving the claims. This agreement was approved by Order of the Bankruptcy Court entered September 5, 2018. [Dkt. No. 111]. As a result of this agreement, Clay Tucker has paid Synovus approximately $9,700, post-petition.

Synovus Bank also filed a Motion to Prohibit Use of Cash Collateral, asserting an interest in certain crop proceeds from the 2017 crop year. Synovus and Ricky Tucker entered into a consensual agreement resolving those claims. This agreement was approved by Order of the Bankruptcy Court on October 15, 2018. [Dkt. No. 149]. As a result of this agreement, Ricky Tucker has paid Synovus approximately $28,000.00, post-petition.

5. <u>Extension of Exclusivity Period for Filing Plan/Obtaining Acceptances</u>

On August 16, 2018, Debtors filed their motion to extend the time within which to file plans and obtain acceptances thereof (Dkt. 91). The Bankruptcy Court entered an order extending the exclusive periods through and including November 15, 2018 and January 14, 2018, respectively. [Dkt. No. 149]. On November 15, 2018, the Debtors sought another thirty day extension of the Exclusive Periods. Debtors filed the Plan during the exclusivity period.

6. <u>Motions for Relief from Stay</u>

Various lenders, including Synovus, Deere & Company, Inc., Suntrust Bank, South Georgia Banking Company, and Farm Bureau Bank filed motions for relief from the automatic stay as to various properties owned by Debtors and serving as the lenders' collateral. All of such motions were resolved consensually on the basis of providing adequate protection, continued for hearing to a later date, or resolved via Debtors' consent to the relief sought in such motion. Debtors note that the parties are in some instances finalizing the form of the orders resolving such motions. Generally, Debtors dispute all of such motions, to the extent not already resolved, on the basis that such lenders are adequately protected in accordance with the Bankruptcy Code and all of the properties that are the subject of such motions are necessary for an effective reorganization.

---

[1] The Debtors noted previously, but note again for clarity, that Synovus Bank has transferred its claim to SummitBridge Capital Investments IV, LLC.

7.    <u>Avoidance of Transfers</u>

The Statements of Financial Affairs filed in these Bankruptcy Cases do not reflect any potential preferential payments based upon the presumption of the insolvency of each Debtor during the 90 days preceding the Petition Date under 11 U.S.C. § 547.  If you received a payment or other transfer within 90 days of the bankruptcy filing, then such transfer may be subject to avoidance under the Bankruptcy Code, including its Sections 544, 547, and 550. The Debtors reserve the right to continue to investigate any such payments and prosecute such claims as necessary. The Plan contemplates that the Debtors shall have 90 days from the Effective Date to initiate any Avoidance Actions.

8.    <u>Potential Claims Against Affiliates</u>

Under Chapter 11 of the Bankruptcy Code, a debtor-in-possession is not charged with the responsibility of examining claims or possible causes of action against Insiders, such as Affiliates, shareholders, officers or directors.  Usually, that duty is placed upon the creditors' committee.[2]  However, a committee has not been appointed in these Bankruptcy Cases. Notwithstanding Debtors' lack of duty to "investigate themselves," in keeping with their responsibilities to make full disclosures to interested parties and to the Court, in the process of preparing their Schedules and Statements of Financial Affairs, Debtors have investigated affiliate transactions which occurred during the two years prior to the Petition Date. The investigation revealed no payments.

9.    <u>Farm Land Rental Agreements</u>

Debtors, on a post-petition basis, entered into multiple one (1) year "land rent" agreements with Tucker Family Farms, LLC for farmland. The rental payment was paid using proceeds from the DIP loan.

10.    <u>Returned Collateral</u>

As part of their internal restructuring efforts, the Debtors determined that they did not need a certain International refrigerated truck. Therefore, the Debtors consented to Farm Bureau Bank's Motion for Relief from Stay.  They anticipate a credit against FBB's Secured Claim for the subsequent sale of the surrendered truck.

---

[2]  The rights, powers, and duties of a debtor-in-possession are specified in Section 1107 of the Bankruptcy Code. Those duties include the powers and functions of a Chapter 11 trustee except the duties specified in Sections 1106(a)(2), (3) and (4) (the "<u>Excluded Duties</u>").  Section 1106(3) includes the duty to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or the formulation of a plan." Conversely, Section 1103(2) of the Bankruptcy Code provides that a committee may "investigate the acts, conduct, assets, liabilities an financial condition of the debtor, the operation of the debtor's business, and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan."

### C.        Pre-Petition Claims

#### 1.  Proofs of Claim

The Court established September 19, 2018 (the "Bar Date"), as the last day for all persons and entities (excluding governmental units) having claims against Debtors to file a Proof of Claim.  The Clerk's office of the Court mailed Notice of these Bar Dates to all Creditors and parties in interest in the respective Cases.

Forty-one (41) Proofs of Claim were filed in the Ricky Tucker case and thirty-seven (37) Proofs of Claim were filed in the Clay Tucker Case. The combined aggregate amount of the Proofs of Claims filed in the Cases was $12,305,397.90. Of this amount, Secured Claims totaled $10,598,956.96, although Synovus Bank and other secured creditors filed duplicate Claims against both of the Debtors.

Since the Debtors are proposing to consolidate Debtors' farm related assets and claims for all purposes and actions associated with confirmation and consummation of the Plan, set forth on **Exhibit C** is a list of all Proofs of Claim filed against the Debtors along with those scheduled Claims which were not marked as disputed, liquidated, or contingent in the Debtors' Schedules. Debtors and Reorganized Debtors reserve all rights with respect to the claims listed on Exhibit C or with respect to any claim which may be subsequently filed.

### D.        Summary of Debtors' Business Since the Petition Date

Since the fiing of these Cases, the Debtors  have focused on reorganizing and improving their business.  During this period, the Tuckers have streamlined their farming operation to focus on watermelons, cotton, and peanuts. Therefore, they have focused most, but not all, of their farming efforts on these crops.[3] Since the Petition Date, the Tuckers have entered into a listing agreement with Weeks Auction Group, Inc. ("WAG") to market and sell the Tifton Plant. The WAG listing agreement was approved by the Court on October 15, 2018. [Dkt. No. 140].

In 2018, the Tuckers grew watermelons through Tucker Family Farms, LLC. TFF is wholly owned by the Tuckers and, following confirmation of the Plan, the Debtors will transfer substantially all of their farming assets into TFF in order to furter streamline and consolidate the farming operation.

In 2018, the Tuckers grew cotton in their individual names. Collectively, they grew aproximately 800 acres of cotton. The Tuckers anticipate that the cotton will sell for prices ranging between $0.75 per pound and $1.00 per pound.  Importantly, the Tuckers' cotton crop received significant damage from Hurricane Michael which decimated Georgia's 2018 cotton crop. The full extent of the damage is not known yet, and will not be fully understood until after the harvest is completed. One issue that the Tuckers anticipate is a reduction in price per pound for some of the cotton, due to discoloration, and, thus, a reduction in "grade", caused by Hurricane Michael.

---

[3] Although Debtors' farming operation focuses primarily on crops, the Debtors have continued to raise cattle and Debtor Clay Tucker has continued to operate his Chicken House operation.

In 2018, the Tuckers grew peanuts in their individual names. Collectively, they grew approximately 577 acres of peanuts. The Tuckers anticipate the peanuts will sell for prices ranging from $355.00 per ton to $500.00 per ton.

The Tuckers have also carefully reviewed their pernament staffing levels.  As a consequence, the permanent payroll, which was comprised of 14 employees on the Petition Date, has been reduced to 6 employees.

### E.      Post-petition Financial Results

Debtors' Post-petition financial performance is reported in the Monthly Financial Reports that Debtors have filed in these Cases.  Copies of these reports can be obtained from the Court or counsel for the Debtors.  All Post-petition financial information contained herein should be read in conjunction with these Monthly Financial Reports.  The Debtors' financial reports are unaudited.

As discussed in Article VIII below, the Debtors have prepared detailed Projections (defined below) of their operating results for the years 2019 through 2024.  In each of these years, earnings before interest, taxes, depreciation, and amortization, and after eliminating non-recurring bankruptcy related expenses, are projected to exceed $525,000.  This level of operating performance is based upon the expectation that farming operations will not be impacted by the lack of labor, or the inability to commence planting operations on a timely basis due to lack of operating funds, or severe crop damage caused by natural disaster. Additionally, the projections anticipate market prices based on current market level, with slight increases in revenues and costs to offset inflation increases.

## V.    SUMMARY OF THE PLAN

THE FOLLOWING IS A BRIEF SUMMARY OF THE PLAN.  HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO READ THE PLAN IN FULL.  HOLDERS OF CLAIMS AND INTERESTS ARE ALSO URGED TO AND SHOULD CONSULT WITH COUNSEL IN ORDER TO UNDERSTAND AND ANALYZE THE PLAN FULLY.  IF CONFIRMED, THE PLAN WILL BECOME A LEGALLY BINDING AGREEMENT BETWEEN THE DEBTORS AND ALL CREDITORS AND PARTIES IN INTEREST.

### A.      Introduction.

Under the Plan, the Reorganized Debtors will continue operations of the farm and pay Allowed Claims in the Case in the amounts and under the terms of the Plan.  The Debtors believe that reorganization under the Plan will be more economical and efficient than effecting a liquidation under Chapter 7 of the Bankruptcy Code because of, among other things, the highly discounted value that would be obtained for the Assets if sold in a quick sale by a Chapter 7 trustee and the increased costs and expenses of a liquidation under Chapter 7 of the Bankruptcy Code resulting from the fees and commissions payable to, and expenses incurred by, a trustee in bankruptcy and such trustee's professional advisors.

The Plan provides for the treatment of Allowed Claims and Equity Interests. A Claim is generally defined by the Plan and the Bankruptcy Code to be a right to payment from the Debtors, or from the property of the Debtors, or a right to an equitable remedy for breach of performance, if such breach gives rise to a right to payment.  The Plan defines an Allowed Claim as follows: (a) a Claim that has been listed by the Debtors on their Schedules as other than disputed, contingent, or unliquidated, to the extent that it is not otherwise a Disputed Claim; (b) a Claim for which a Proof of Claim has been Filed by the applicable Bar Date or has otherwise been deemed timely Filed under applicable law, to the extent that it is not otherwise a Disputed Claim; or (c) a Claim that is allowed: (i) in any Stipulation of Amount and Nature of Claim executed by the Debtors or the Reorganized Debtor, as applicable, and Creditor; (ii) in any contract, instrument, or other agreement entered into in connection with the Plan; (iii) in a Final Order; or (iv) pursuant to the terms of the Plan.

The categories of Claims and Equity Interests listed below classify Claims and interests for all purposes, including voting, Confirmation and Distribution pursuant to the Plan and pursuant to Sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan designates twenty-on (21) Classes of Claims (including subclasses) and one Class of Equity Interests.  These Classes take into account the differing nature and priority under the Bankruptcy Code of the various Claims and interests.  A Claim or interest will be deemed classified in a particular Class only to the extent that the Claim or interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or interest qualifies within the description of such different Class.  A Claim or interest is in a particular Class only to the extent that such Claim or interest is allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.  To the extent that the holders of any Allowed Claims or interests object to the Debtors' classification scheme, such objections will be considered at the Confirmation Hearing, and if sustained, the classifications outlined below will be deemed modified in accordance with any Final Order sustaining such objections.  Generally, Distributions under the Plan will be made to holders of Allowed Claims in accordance with their respective priorities as set forth under the Bankruptcy Code, the Confirmation Order, or any other Final Order.

Any Class of Claims that, as of the date of the commencement of the Confirmation Hearing, contains no Allowed Claims will be deemed deleted from the Plan for purposes of determining acceptance or rejection of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

The classification of Claims against and Equity Interests in the Debtors, and their respective voting rights pursuant to the Plan are as follows:

| Class | Impairment | Treatment |
|---|---|---|
| **Unclassified Claims** | Impaired | Certain Claims may not be classified under Chapter 11 plans, including: Claims entitled to Administrative Expense Status, U.S. Trustee Fees, and Court Costs. The Plan provides for payment of Unclassified Claims on or before the Effective Date of this Plan, unless otherwise agreed by the Holder of such an |

| | | |
|---|---|---|
| | | Unclassified Claim. Claims entitled to Priority Status under 11 U.S.C. § 507(a)(8) (certain tax claims) shall be paid in a manner authorized under 11 U.S.C. § 1129(a)(9)(C), within the times specified therein. |
| **Class 1 –** Allowed Non-tax priority claims | | There are no known claims in this Class. If such claims are Allowed by the Bankruptcy Court, except to the extent the Holder of an Allowed Class 1 Claim agrees to other, lesser treatment, any Holder of an Allowed Class 1 Claim shall be paid in full within the later of fourteen (14) days after the Effective Date or the date of allowance of such claims, which date of payment shall be deemed to be the Effective Date with respect to any such Claims. |
| **Class 2 – Allowed Secured Claim of** SummitBridge Capital Investments IV, as assignee of Synovus Bank against Ricky Tucker and Clay Tucker. | Impaired | The Allowed Secured Claim of SummitBridge Capital Investments IV, LLC ("Summit"), collateralized by, among other things, multiple parcels of real property and numerous pieces of farming equipment (the "Class 2 Secured Claim"), is anticipated to total, in the aggregate, approximately $7,859,800, as of the Effective Date. The Reorganized Debtors shall pay the allowed amount of the Class 2 Secured Claim, in full, together with interest at the rate of 3.25% per annum as follows: (1) the Reorganized Debtors shall liquidate the Tifton Plant, Chicken Houses, and certain farm equipment, with all net proceeds to be applied to the principal balance of the Class 2 Secured Claim (Debtors anticipate such liquidations will result in net proceeds of at least $2,000,000); (2) the remaining balance of the allowed Class 2 Secured Claim after application of the liquidation proceeds shall be paid in full, together with interest at the rate of 3.25%, amortized over 360 months, commencing with an interest only payment due on December 31, 2019, and a payment of principal and interest due on December 31, 2020, with a like payment of principal and interest due annually on December 31, 2018, thereafter, with a final balloon payment equal to the remaining principal |

| | | |
|---|---|---|
| | | balance as the 10th payment, such that the Class 2 claim is paid in full in 120 months. The Allowed Secured Claim included in the Class 2 Secured Claim will be evidenced by a new modified secured promissory note from the Reorganized Debtor in substantially the form shown on **Exhibit 1** (or such other form as may be agreed among the parties) to this Plan (the "Modified Class 2 Secured Note").  The principal amount of the Modified Class 2 Secured Note shall equal the amount of the Class 2 Allowed Secured Claim. The Holder of the Class 2 Secured Claim shall retain all prepetition liens (excluding Crop liens) securing the Modified Class 2 Secured Note until such note is satisfied in full, and may be pre-paid in whole or part at any time, without penalty. |
| **Class 3** – Allowed Secured Claim of Deere & Company, Inc. against Ricky Tucker | Impaired | The Allowed Secured Claim of Deere & Company, Inc. ("Deere") against Ricky Tucker, collateralized by, among other things, multiple pieces of farming equipment (the "Class 3 Secured Claim"), is anticipated to total, in the aggregate, approximately $368,179.00, as of the Effective Date. The Reorganized Debtors shall pay the allowed amount of Class 3 Secured Claim, in full, as follows: (1) on the Effective Date, the Reorganized Ricky Tucker shall surrender his interest in a 200 JD Excavator (Clay Tucker shall retain his interest in the 200 JD Excavator as provided in Class 4) and 6190 Tractor, upon which surrender the Reorganized Debtor shall receive a credit equal to $167,500; (2) the remaining balance, estimated to total $223,000, shall be paid, together with interest at the rate of 3.00% per annum, amortized over 120 months, commencing on December 31, 2019, with a like payment of $26,142.40 due annually, such that the Class 3 Secured Claim is paid in full in 120 months. The Allowed Secured Claim included in Class 3 will be evidenced by a new modified secured promissory note from the Reorganized Debtors in substantially the form shown on **Exhibit 1** to this Plan (the "Modified Class 3 Secured Note").  The principal amount of the Modified Class 3 Secured Note shall equal the amount of the |

| | | Class 3 Allowed Secured Claim. The Holder of the Class 3 Secured Claim shall retain all prepetition liens securing the Modified Class 3 Secured Note until such note is satisfied in full, and may be pre-paid in whole or part at any time, without penalty. |
|---|---|---|
| **Class 4** – Allowed Secured Claim of Deere & Company, Inc. against Clay Tucker. | Impaired | The Allowed Secured Claim of Deere & Company, Inc. ("Deere") against Ricky Tucker, collateralized by, among other things, multiple pieces of farming equipment (the "Class 4 Secured Claim"), is anticipated to total, in the aggregate, approximately $428,492.45, as of the Effective Date. The Reorganized Debtors shall pay the allowed amount of Class 4 Secured Claim, in full, together with interest at the rate of 3.00% per annum, amortized over 120 months, commencing on December 31, 2019, with a like payment of $50,232.39 due annually, such that the Class 4 Secured Claim is paid in full in 120 months. The Allowed Secured Claim included in the Class 4 will be evidenced by a new modified secured promissory note from the Reorganized Debtors in substantially the form shown on **Exhibit 1** to this Plan (the "Modified Class 4 Secured Note").  The principal amount of the Modified Class 4 Secured Note shall equal the amount of the Class 4 Allowed Secured Claim. The Holder of the Class 4 Secured Claim shall retain all prepetition liens securing the Modified Class 4 Secured Note until such note is satisfied in full, and may be pre-paid in whole or part at any time, without penalty. |
| **Class 5** – The Allowed Secured Claim of Farm Bureau Bank against Ricky Tucker. | Impaired | The Allowed Secured Claim of Farm Bureau Bank ("FBB") against Ricky Tucker, collateralized by, among other things, multiple pieces of farming equipment (the "Class 5 Secured Claim"), is anticipated to total, in the aggregate, approximately $47,065.51, as of the Effective Date. The Reorganized Debtors shall pay the allowed amount of the Class 5 Secured Claim, in full, together with interest at the rate of 4.25% per annum, amortized over 84 months, commencing on December 31, 2019, with a like payment of $7,914.18 due annually on December 31, such that the |

| | | |
|---|---|---|
| | | Class 5 Secured Claim is paid in full in 84 months. The Allowed Secured Claim included in Class 5 will be evidenced by a new modified secured promissory note from the Reorganized Debtors in substantially the form shown on **Exhibit 1** to this Plan (the "Modified Class 5 Secured Note").  The principal amount of the Modified Class 5 Secured Note shall equal the amount of the Class 5 Allowed Secured Claim. The Holder of the Class 5 Secured Claim shall retain all prepetition liens securing the Modified Class 5 Secured Note until such note is satisfied in full, and may be pre-paid in whole or part at any time, without penalty. |
| **Class 6** – The Allowed Secured Claim of Farm Bureau Bank against Clay Tucker. | Impaired | The Allowed Secured Claim of Farm Bureau Bank ("FBB") against Clay Tucker, collateralized by, among other things, multiple pieces of farming equipment (the "Class 6 Secured Claim"), is anticipated to total, in the aggregate, approximately $92,365.00, as of the Effective Date. The Reorganized Debtors shall pay the allowed amount of Class 6 Secured Claim, in full, together with interest at the rate of 4.25% per annum, amortized over 84 months, commencing on December 31, 2019, with a like payment of $15,531.38 due annuallyon December 31, such that the Class 6 Secured Claim is paid in full in 84 months. The Allowed Secured Claim included in Class 6 will be evidenced by a new modified secured promissory note from the Reorganized Debtors in substantially the form shown on **Exhibit 1** to this Plan (the "Modified Class 6 Secured Note").  The principal amount of the Modified Class 6 Secured Note shall equal the amount of the Class 6 Allowed Secured Claim. The Holder of the Class 6 Secured Claim shall retain all prepetition liens securing the Modified Class 6 Secured Note until such note is satisfied in full, and may be pre-paid in whole or part at any time, without penalty . |
| **Class 7** – Allowed Secured Claims of South Georgia Banking Company against Ricky Tucker. | Impaired | The Allowed Secured Claim of South Georgia Banking Compay ("SGB") against Ricky Tucker, collateralized by certain |

| | | pieces of farming equipment (the "Class 7 Secured Claim"), is anticipated to total, in the aggregate, approximately $26,000.00, as of the Effective Date. The Reorganized Debtors shall pay the allowed amount of Class 7 Secured Claim, in full, together with interest at the rate of 4.25% per annum, amortized over 84 months, commencing on December 31, 2019, with a like payment of $4,768.48 due annually on December 31, such that the Class 7 Secured Claim is paid in full in 84 months. The Allowed Secured Claim included in Class 7 will be evidenced by a new modified secured promissory note from the Reorganized Debtors in substantially the form shown on **Exhibit 1** to this Plan (the "Modified Class 7 Secured Note"). The principal amount of the Modified Class 7 Secured Note shall equal the amount of the Class 7 Allowed Secured Claim. The Holder of the Class 7 Secured Claim shall retain all prepetition liens securing the Modified Class 7 Secured Note until such note is satisfied in full, and may be pre-paid in whole or part at any time, without penalty. |
|---|---|---|
| **Class 8** – Allowed Secured Claim of Suntrust Bank against Ricky Tucker. | Impaired | The Allowed Secured Claim of Suntrust Bank ("Suntrust Bank") (the "Class 8 Secured Claim"), collateralized by a 2012 Dodge Ram 1500, is estimated to total approximately $22,000.00 as of the Effective Date. The Class 8 Secured Claim will be satisfied in full as follows: On the Effective Date, Reorganized Debtors shall surrender to the Holder of the Class 3 Secured Claim all Debtor's interest in the property collateralizing such Secured Claim, upon which surrender Reorganized Debtor shall receive a credit against the Class 8 Secured Claim in full satisfaction of such Secured Claim. To the extent the Court determines that a balance remains on the Class 8 Secured Claim after the surrender, such remaining balance shall be included in Class 18. |
| **Class 9** – Allowed Secured Claim of CNH Industrial Capital, Inc. against Clay Tucker. | Impaired | The Allowed Secured Claim of CNH Industrial Capital, Inc. ("CNH") against Clay Tucker, collateralized by certain pieces of farming equipment (the "Class 9 Secured Claim"), is anticipated to total, in the |

| | | aggregate, approximately $6,740.86, as of the Effective Date. The Reorganized Debtor shall pay the allowed amount of Class 9 Secured Claim, in full, together with interest at the rate of 3.25% on the later of the Effective Date or December 31, 2019. |
|---|---|---|
| **Class 10 –** Allowed Secured Claim of CNH Industrial Capital, Inc. against Ricky Tucker. | Impaired | The Allowed Secured Claim of CNH Industrial Capital, Inc. ("CNH") against Ricky Tucker, collateralized by certain pieces of farming equipment (the "Class 10 Secured Claim"), is anticipated to total, in the aggregate, approximately $29,000.00, as of the Effective Date. The Reorganized Debtors shall pay the allowed amount of Class 10 Secured Claim, in full, with interest at the rate of 4.25% per annum, amortized over 60 months, commencing on December 31, 2019, with a like payment of $6,560 due annually on December 31, such that the Class 10 Secured Claim is paid in full in 60 months. The Allowed Secured Claim included in Class 10 will be evidenced by a new modified secured promissory note from the Reorganized Debtor in substantially the form shown on **Exhibit 1** to this Plan (the "Modified Class 7 Secured Note").  The principal amount of the Modified Class 10 Secured Note shall equal the amount of the Class 10 Allowed Secured Claim. The Holder of the Class 10 Secured Claim shall retain all prepetition liens securing the Modified Class 10 Secured Note until such note is satisfied in full, and may be pre-paid in whole or part at any time, without penalty. |
| **Class 11 –** Allowed Secured Claim of AgGeorgia Farm Credit, ACA | Impaired | The Allowed Secured Claim of AgGeorgia Farm Credit, ACA ("AgGeorgia") against Ricky Tucker and Clay Tucker, collateralized by certain pieces of irrigation equipment (the "Class 11 Secured Claim"), is anticipated to total, in the aggregate, approximately $101,830.00, as of the Effective Date. The Reorganized Debtors shall pay the allowed amount of Class 11 Secured Claim, in full, with interest at the rate of 4.25% per annum, amortized over 84 months, commencing on December 31, 2019, with a like payment of $17,122.94 due annually on December 31, such that the Class 11 Secured Claim is paid in full in 84 |

| | | |
|---|---|---|
| | | months. The Allowed Secured Claim included in Class 11 will be evidenced by a new modified secured promissory note from the Reorganized Debtors in substantially the form shown on **Exhibit 1** to this Plan (the "<u>Modified Class 11 Secured Note</u>").  The principal amount of the Modified Class 11 Secured Note shall equal the amount of the Class 11 Allowed Secured Claim. The Holder of the Class 11 Secured Claim shall retain all prepetition liens securing the Modified Class 11 Secured Note until such note is satisfied in full, and may be pre-paid in whole or part at any time, without penalty. |
| **Class 12** – Allowed Secured Claims of Wells Fargo Dealer Services against Clay Tucker. | Impaired | The Allowed Secured Claim of Well Fargo Dealer Services against Clay Tucker (the "<u>Class 12 Secured Claim</u>") consists of a vehicle financing agreement secured by a 2015 Chevy Tahoe and 2014 Ford F-350 Flatbed, upon which there is an estimated outstanding balance of $53,167.68 as of the Effective Date, shall be paid as follows:  (1) on the Effective Date, Reorganized Debtor shall surrender to the Holder of the Class 12 Secured Claim the 2015 Tahoe, which collateralizes a portion of such Secured Claim, upon which surrender Reorganized Debtors shall receive a credit against the Class 12 Secured Claim equal to the Kelly Blue Book value of the Tahoe as of the Effective Date (estimated to be $28,000). The remaining balance of the Allowed Class 12 Secured Claim shall be paid in full, per the terms of the existing note and loan documents in effect on the Effective Date, in approximate monthly installments of $780 each, with any defaults or arrearages to be cured in accordance with 11 U.S.C. § 1124 in not more than 12 equal monthly installments commencing on the Effective Date with a like payment each month thereafter until the arrearage is paid in full. To the extent the Court determines that a unsecured balance remains on the Class 12 Secured Claim after the surrender, such remaining deficiency balance shall be included in Class 18. The Holder of the Class 12 Secured Claim shall retain all liens securing such Claim until the Claim is paid in full. Class 12 is impaired. |

| | | |
|---|---|---|
| **Class 13** – Allowed Secured Claims of Wells Fargo Bank, N.A. against Clay Tucker. | Unimpaired | The Allowed Secured Claim of Well Fargo Bank against Clay Tucker (the "Class 13 Secured Claim") consists of a first mortgage on his personal residence located at 984 Whitley Tucker Road, Enigma, Berrien County, Georgia upon which there is an estimated outstanding balance of $156,868.64 as of the Effective Date.  The Class 13 Secured Claim shall be paid by the Reorganized Debtors per the terms of the existing note and loan documents in effect on the Effective Date, in approximately equal monthly installments of $1814.00 each, with any defaults or arrearages to be cured in accordance with 11 U.S.C. § 1124 in not more than 12 equal monthly installments commencing on the Effective Date with a like payment each month thereafter until the arrearage is paid in full. The Holder of the Class 13 Secured Claim shall retain all liens securing such Claim until the Claim is paid in full. |
| **Class 14** – Allowed Secured Claims of Diversified Financial against Ricky Tucker and Clay Tucker. | Impaired | The Allowed Secured Claim of Diversified Financial Services, Inc. ("Diversified") against Ricky Tucker and Clay Tucker, collateralized by certain pieces of farming equipment (the "Class 14 Secured Claim"), is anticipated to total, in the aggregate, approximately $70,440 as of the Effective Date. The Reorganized Debtors shall pay the allowed amount of Class 14 Secured Claim, in full, with interest at the rate of 4.25% per annum, amortized over 84 months, commencing on December 31, 2019, with a like payment of $11,844.64 due annually on December 31, such that the Class 14 Secured Claim is paid in full in 84 months. The Allowed Secured Claim included in the Class 14 Secured Claim will be evidenced by a new modified secured promissory note from the Reorganized Debtors in substantially the form shown on **Exhibit 1** to this Plan (the "Modified Class 14 Secured Note").  The principal amount of the Modified Class 14 Secured Note shall equal the amount of the Class 14 Allowed Secured Claim. The Holder of the Class 14 Secured Claim shall retain all prepetition liens securing the Modified Class 14 Secured Note until such note is satisfied in full, and may be pre-paid in whole or part at |

| | | any time, without penalty. |
|---|---|---|
| **Class 15** – Allowed Secured Claims of Robins Financial Federal Credit Union against Ricky Tucker. | Unimpaired | The Allowed Secured Claim of Robins Financial Federal Credit Union ("<u>Robins</u>") against Ricky Tucker collateralized by a 2014 Jeep Cherokee (the "<u>Class 15 Secured Claim</u>"), is estimated to total approximately $14,896.26, as of the Effective Date. The Class 15 Secured Claim will be satisfied in full as follows: On the Effective Date, Reorganized Debtor shall surrender to the Holder of the Class 15 Secured Claim all of the property of Debtor collateralizing such Secured Claim, upon which surrender Reorganized Debtors shall receive a credit against the Class 15 Secured Claim in full satisfaction of such Secured Claim. To the extent the Court determines that a balance remains on the Class 15 Secured Claim after the surrender, such remaining balance shall be included in Class 18. |
| **Class 16** – Allowed Secured Claim of Fifth Third Bank against Ricky Tucker | Unimpaired | The Allowed Secured Claim of Fifth Third Bank against Ricky Tucker (the "<u>Class 16 Secured Claim</u>") consists of a vehicle financing agreement secured by a 2013 GMC 2500 upon which there is an estimated outstanding balance of $6,624.88 as of the Effective Date. The Class 16 Secured Claim shall be paid, in full, on the Effective Date. |
| **Class 17** – Allowed Secured Claims of Bank of the West, N.A. against Ricky Tucker. | Impaired | The Allowed Secured Claim of Bank of the Bank, N.A. ("<u>BOW</u>") against Ricky Tucker, collateralized by certain pieces of equipment (the "<u>Class 17 Secured Claim</u>"), anticipated to total, in the aggregate, approximately $17,000 as of the Effective Date. The Reorganized Debtor shall pay the allowed amount of the Class 17 Secured Claim, in full, with interest at the rate of 4.25% per annum, amortized over 60 months, commencing on December 31, 2019, with a like payment of $3,845.52 due annually, on December 31, such that the Class 17 Secured Claim is paid in full in 60 months. The Allowed Secured Claim included in the Class 17 Secured Claim will be evidenced by a new modified secured promissory note from the Reorganized Debtor in substantially the form shown on **Exhibit 1** to this Plan (the "<u>Modified Class 17 Secured Note</u>"). The principal amount |

28

| | | |
|---|---|---|
| | | of the Modified Class 17 Secured Note shall equal the amount of the Class 17 Allowed Secured Claim. The Holder of the Class 17 Secured Claim shall retain all prepetition liens securing the Modified Class 17 Secured Note until such note is satisfied in full, and may be pre-paid in whole or part at any time, without penalty. |
| **Class 18** – Allowed Unsecured Deficiency Claims | | At the Confirmation Hearing, the Bankruptcy Court will determine the Allowed Amount of the Deficiency Claim of each Holder of Allowed Secured Claims included in Classes 2 through 17, Article I, who have not elected to be treated as provided under 11 U.S.C. § 1111(b), and the Confirmation Order shall include a finding or stipulation of the Allowed Amount of each such resulting unsecured Deficiency Claim, which are estimated to total $1,315,694.94.   That determination shall constitute each such Holder's Allowed Unsecured Deficiency Claim in Class 18. Each such Holder of an Allowed Unsecured Deficiency Claim in Class 18 will be paid on account of such Claim, through TFF, the Holder's Pro Rata share of the Individual Net Liquidation Value(s) of the separate estates of the Individual Debtors obligated to each such Holder, together with Plan Interest, in not less than five annual distributions equal to the Combined Net Disposable Income (as defined in Schedule 1 of the Plan) of the Reorganized Debtors for the preceding calendar year, with each such annual payment of Combine Net Disposable Income for the previous calendar year being due on February 1, of the following year. On or before the 31st day of December, commencing on the Effective Date, each Individual Debtor will make annual deposits to TFF that either equal each Debtor's Net Disposable Income (as defined in Schedule 1 of the Plan) for the preceding calendar month or shall otherwise total, by January 15 of the next following calendar year, not less than each Individual Debtor's Net Disposable Income for the previous calendar year (commencing upon the Effective Date).  TFF shall, in turn make annual distributions, Pro Rata, to Holders of Allowed Unsecured Claims in |

| | | |
|---|---|---|
| | | Classes 18 and 19, on or before February 1 of the Calendar Year following the Effective Date (estimated to be February 1, 2020), continuing on each anniversary of such date, commencing on such anniversary date, in 2020 (on account of the Combined Net Disposable Income for the period of five (5) years following the Effective Date), with subsequent distributions on each succeeding anniversary date thereafter until the later of such anniversary date in 2024, or such time by which the value of such payments equal or exceed the Combined Individual Liquidation Values. The value of the Combined Liquidation Value to be paid to Holders of Allowed Claims in Classes 18 and 19 shall not be less than $166,032.35. Debtors project that Holders of Allowed Claims in Classes 18 and 19 shall receive a total of approximately $250,000 under the Plan. |
| **Class 19** – Allowed Claims of General Unsecured Creditors (other than Allowed Unsecured Claims included in Classes 18 and 20). | Impaired | The Allowed Unsecured Claims of General Unsecured Creditors (other than Allowed Unsecured Claims included in Classes 18 and 20) (the "<u>Class 19 Unsecured Claims</u>") are estimated to total $1,584,352.92, as of the Effective Date. Reorganized Debtors shall pay the allowed amount of the Class 19 Unsecured Claims in tandem with Class 18. |
| **Class 20** – Allowed Unsecured Administrative Convenience Class Claims of $3,000 or Less (including those creditors in classes 18 and 19 that elect to "opt-in" to Class 20) | Impaired | The Allowed Unsecured Administrative Convenience Class Claims of $3,000 or Less (including those creditors in classes 18 and 19 that elect to "opt-in" to Class 20) (the "<u>Class 20 Unsecured Convenience Class Claims</u>"), estimated to total $20,000, as of the Effective Date shall be paid, in full, by the Reorganized Debtors, within 30 days after the Effective Date. |
| **Class 21-** Interests of Debtors | Impaired | On the Effective Date, the Individual Debtors will retain their individual residences and personal property but will transfer their interests in the Farm Assets (exclusive of the Tifton Plant and Chicken Houses) to Tucker Family Farms, LLC, subject to all liens of record securing Allowed Secured Claims provided for under this Plan, in exchange for corresponding interests in Tucker Family Farms, to wit: Ricky Tucker – 52.17% and Clay Tucker – |

| | | 47.83%. Thereafter, the rights and obligations of the Individual Debtors with respect to the Farm Property will be governed by the Operating Agreement of Tucker Family Farms, LLC, which shall incorporate the provisions of this Plan. |
|---|---|---|

### B.    Unclassified Claims

1.    <u>General Administrative Claims.</u>

The Plan provides that, except to the extent the holder of an Allowed Administrative Claim agrees to other, lesser treatment, each holder of an Allowed Administrative Claim (including without limitation Cure Cost Claims) will be paid in respect of such Allowed Claim the full amount thereof, in Cash, by the later of (i) the Effective Date, or (ii) the date on which such Claim becomes an Allowed Claim.

2.    Statutory Fees.

The Plan provides that Allowed Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid in Cash as such fees are due in an amount equal to the amount of such statutory fees.

3.    Fee Claims.

The Plan provides thatProfessionals having Allowed Fee Claims shall be paid in full, in Cash, by Debtors or Reorganized Debtors in accordance with the Order Establishing Compensation Procedures for Professionals entered in the Bankruptcy Cases on May 18, 2018 [Dkt. No. 46] on the date upon which the Bankruptcy Court order allowing such Fee Claim becomes a Final Order.  Upon entry of the Confirmation Order, Debtors shall set aside in escrow any unpaid amounts estimated to be owed to Professionals for Fee Claims through the Effective Date (less amounts previously  paid on an interim basis)) pending entry of a Final Order on each such Professionals' application for Allowance of its Fee Claim.   After the Effective Date, Professionals of the Reorganized Debtors shall be compensated as set forth below in this Plan. Post-confirmation fees may be paid by Reorganized Debtors in the ordinary course of business without application to, or approval by, the Bankruptcy Court.

Such Professionals and Entities must File and serve on the United States Trustee, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Bankruptcy Court, an application for final allowance of such Fee Claim no later than 60 days after service of the notice of entry of the Confirmation Order.  **Failure to File timely and serve such application will result in the Fee Claim being forever barred and discharged.**  Objections to any Fee Claim must be Filed and served on the parties that were served with such application and the requesting party by the later of (a) 30 days after the Effective Date; (b) 30 days after the filing of the applicable request for payment of the Fee Claim; or (c) such later date as provided for by order of the Bankruptcy Court.

31

4.      Bar Dates for General Administrative Claims.

General Administrative Bar Date Provisions: The Plan provides that the holder of an Administrative Claim other than (1) a Fee Claim, (2) a Post-petition liability incurred and payable in the ordinary course of business by a Debtor (and not past due), (3) an Administrative Claim that has been Allowed on or before the Effective Date, (4) statutory fees payable pursuant to 28 U.S.C. § 1930, and (5) Cure Cost Claims, must file with the Bankruptcy Court and serve on the Debtors, the Committee, and the Office of the United States Trustee, a request for payment of such Administrative Claim within thirty (30) days after service of the Confirmation Order (the "Administrative Bar Date").  Such request must include at a minimum (a) the name of the holder of the Claim, (b) the amount of the Claim, and (c) the basis of the claim.  **Failure to File and serve such request timely and properly will result in the Administrative Claim being forever barred and discharged.**  Objections to general Administrative Claims must be Filed and served on the parties that were served with such Claims or requests and the requesting party by the later of (a) 30 days after the Effective Date; (b) 30 days after the Filing of the applicable request for payment of Administrative Claims; or (c) such later date as provided for by order of the Bankruptcy Court, which order may be entered upon application of the Reorganized Debtors without further notice or hearing (the "Administrative Claim Objection Deadline").  **The holders of the Administrative Claims enumerated in (1)–(5) above will not be required to file a request for payment of its Administrative Claims, and will be paid as specified in Article IV of the Plan**.

Bar Dates for Fee Claims for Professionals or other Entities asserting a Fee Claim for services rendered *before* the Effective Date.  Such Professionals and Entities must File and serve on the United States Trustee, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Bankruptcy Court, an application for final allowance of such Fee Claim no later than 60 days after service of the notice of entry of the Confirmation Order.  ***Failure to File timely and serve such application shall result in the Fee Claim being forever barred and discharged.***  Objections to any Fee Claim must be Filed and served on the parties that were served with such application and the requesting party by the later of (a) 30 days after the Effective Date; (b) 30 days after the filing of the applicable request for payment of the Fee Claim; or (c) such later date as provided for by order of the Bankruptcy Court (the "Fee Objection Deadline").

5.      Priority Tax Claims.

Priority Tax claims consist of any Claim of a governmental unit of a kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.  These unsecured Claims are given a statutory priority in right of payment.  The Plan provides that each holder of an Allowed Priority Tax Claim, if any, will be paid in respect of such Allowed Claim (including with respect to any interest that is determined to be part of its Allowed Claim), at the option of the Reorganized Debtor: (a) the full amount thereof, in Cash, by the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim; or (b) payment in Cash installments with the appropriate statutory interest thereon on each anniversary of the Effective Date, until the fifth anniversary of the applicable Petition Date; or (c) shall receive such lesser amount or other treatment as the holder of an Allowed Priority Tax Claim and the Reorganized Debtor might otherwise agree.

**C.      Classification and Treatment of Claims and Interests.**

The treatment of and consideration to be received by holders of Allowed Claims and Interests pursuant to Article III of the Plan shall be in full and in complete satisfaction, settlement, and release of the Estate's obligations with respect to such Claims and Interests.  The Estate's obligations in respect of such Claims and Interests shall be satisfied in accordance with the terms of the Plan, as shown in the foregoing chart.  Transfers of Claims are governed by Bankruptcy Rule 3001.  The Reorganized Debtors need not recognize any transfer of a Claim that fails to comply with such Rule.

**D.      Means of Implementation of the Plan.**

1.      <u>Reorganized Debtors and Powers And Duties.</u>

The Joint Plan contemplates, and upon Confirmation, effectuates, along with all necessary accompanying documents and instruments, the transfer of each Debtor's respective individual interests in their farm related real and personal property to "Tucker Family Farms, LLC," an existing Georgia limited liability company wholly owned by the Debtors upon Confirmation (referred to herein as "<u>TFF</u>").  The assets (the "<u>Farm Assets</u>") to be transferred to TFF, and the respective membership interests of Ricky Tucker and Clay Tucker (collectively, the "<u>TFF Members</u>") in Tucker Family Farms, LLC resulting from the transfer of the Farm Assets are more particularly described on **<u>Exhibit 2</u>**  of the Plan.  Generally, TFF shall take title to the Farm Assets, subject to all existing liens and encumbrances, but otherwise free and clear of all Claims and Interests.  The transfer of the Farm Assets to TFF will be accomplished as a tax-free exchange, without an actual or deemed change in control.  TFF will manage its operations and the Tifton Plant operations, until such time as the Tifton Plant is sold.  Subject to preparing all other appropriate organizational documents for TFF, including, without limitation, an operating agreement, the Joint Plan shall serve as the agreement of the Tuckers to restructure as provided herein, and shall bind Reorganized Debtors, TFF, and all Parties-in-Interest in these Bankruptcy Cases.

The Joint Plan provides that it will be administered by the respective Reorganized Debtors.  They will be vested with power and authority over all of the remaining assets of their respective Estates, with the obligation to administer and consummate the conveyances to TFF and distributions in accordance with the Plan.  The Reorganized Debtors shall be deemed as of the Confirmation of the Plan to be the general representatives of the Estates as authorized under and pursuant to the Bankruptcy Code, specifically including without limitation Section 1123(b)(3).  The Reorganized Debtors shall be indemnified by the Estates for fees and costs, including attorneys' fees, for any actions they take or fail to take, except for those done with gross negligence or malicious intent.

The Joint Plan provides that the Reorganized Debtors shall be vested with and shall have all rights, powers, and duties that the Debtors-in-possession had immediately prior to Confirmation under Sections 1106, 1107, 1108 of the Bankruptcy Code and otherwise, including, without limitation, with respect to the Causes of Action (whether or not commenced as of Confirmation).  The Reorganized Debtors shall have exclusive control of the Assets, including,

without limitation, the Causes of Action. The Reorganized Debtors shall have authority to authorize the sale, refinance, abandonment, or other liquidation of any or all Assets. The Reorganized Debtors shall be the representatives of the Estates and shall have the capacity to sue and be sued, as provided under Sections 323 and 1123(b)(3) of the Bankruptcy Code.

The Joint Plan provides that the Reorganized Debtors shall be empowered to and shall make, or, as applicable, shall cause TFF to make, all distributions required to be made under the Plan. The Reorganized Debtors shall be authorized and empowered to fully act as of the Effective Date, including, without limitation, to (a) to implement the Plan, borrow money, purchase and sell assets, and take all further action as may be required in the best interests of the Reorganized Debtors and consummation of the Plan, (b) prosecute, settle, or release all Causes of Action, in accordance with the best interest of and for the benefit of the Creditors entitled to receive distributions under the Plan; (c) prosecute objections to Claims; (d) resolve Disputed Claims; (e) make distributions to the holders of Allowed Administrative Claims, Allowed Priority Tax Claims, and holders of other Allowed Claims (as their respective interests may appear in accordance with the Plan) in as prompt, efficient, and orderly fashion as possible in accordance with the Plan; (f) perform administrative services related to the implementation of the Plan; (g) employ attorneys and other Professionals, as further set forth below, to assist in fulfilling the Reorganized Debtors' obligations under the Plan; and (h) otherwise act in accordance with the Plan and orders of the Bankruptcy Court. The Reorganized Debtors shall operate TFF substantially in conformity with the Budget; provided, however, that departures from the Budget (other than failures to make distributions or payments required under the Plan), standing alone, shall not constitute a default under the Plan. The Budget is submitted to creditors as a template of future operations of Debtors (currently operating as joint venture and to take form as a limited liability company on and after the Effective Date) through TFF, to demonstrate feasibility of the Plan and is aspirational in nature. Strict compliance with the Budget shall not be construed as a contractual obligation to creditors under the Plan.

The Plan provides that the Reorganized Debtors will perform the duties and obligations imposed on the Reorganized Debtors with reasonable diligence and care under the circumstances. For additional information about the Reorganized Debtors, please refer to the full text of the Plan.

        2.    <u>Closing of Case</u>

The Plan provides that, as soon as reasonably practicable following the substantial consummation of the Plan, the Reorganized Debtor will seek authority from the Bankruptcy Court to close the Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

        3.    <u>Executory Contracts</u>

On the Confirmation Date, all Executory Contracts and unexpired leases, including without limitation any farm leases or insurance policies, are deemed assumed, in accordance with the provisions of sections 365 and 1123, and any other relevant provisions of the Bankruptcy Code. The Debtors assert that all obligations due and owing under the Executory Contracts and unexpired leases to be assumed hereunder are current. However, any Allowed Cure Costs (which are defined in the Plan as Administrative Claims) associated with the assumed

Executory Contract will be paid in accordance with Section 5.2 of the Plan. Notwithstanding the foregoing, nothing in the Plan requires payment of any Claim arising out of an Executory Contract or unexpired lease that is disputed until all such disputes as to that Executory Contract or unexpired lease are resolved

### 4. Vesting of Assets.

The Plan provides that, on the Effective Date, title to all property of the Debtors will revest in the respective Debtors as provided in sections 1141 and 524 of the Bankruptcy Code.

### 5. Net Disposable Income.

Certain Payments to Classes 18 and 19 under the Plan shall be made from ***Combined Net Disposable Income*.** The calculation of Combined Net Disposable Income shall be made on an annual basis as set forth below and is intended to determine the amount that will be distributable to Classes 18 and 19. Each Crop Year begins on January 1st and ends on December 31st.  Except for the estimated value of unsold harvested crop inventory (if any), the calculations shall be based on account balances as they appear in the Debtors balance sheet as of December 31st of each year. The Reorganized Debtors' financial records will continue to be prepared and maintained primarily by Debtors' accounting staff.

The philosophy behind the concept of using Combined Net Disposable Income is to isolate, to the fullest extent possible, TFF's performance for each Crop Year and to account for any income received by Debtors not attributable to the profits of TFF.  The formula explained below accomplishes this by taking the cash balance on TFF's books at the end of a Crop Year, and then adjusting it by removing amounts (i) which relate to the previous Crop Year; (ii) which relate to the current Crop Year but (a) have not yet been realized or converted to Cash, or (b) have not yet been paid; and (iii) are not allocated to TFF's working capital or capital expense reserves

The "Combined Net Disposable Income" shall be calculated at the end of crop year, i.e. December 31, 2018. Debtors' Net Disposable Income shall be calculated as follows:

Debtors' (through TFF) Net Farm Income (as defined in Schedule 1 of the Plan)for a given crop year, plus each individual Debtors' Net Disposable Income, as determined under 1325(b)(2).

Each Distribution from Net Disposable Income to holders of Claims in Class 18 and 19, will be accompanied by a copy of the Reorganized Debtors' calculation of such Net Disposable Income and the Distributions therefrom.  In addition, the Reorganized Debtors' financial statements shall be available for review by a Creditor upon reasonable written notice during normal business hours, no more than once a year, subject to execution of an appropriate confidentiality agreement.

### E.    Provisions Governing Payment and Distributions.

References in this section to the "Reorganized Debtors" shall also apply to Tucker Family Farms, LLC who will make Plan payments and distributions on behalf of the Reorganized Debtors as provided in the Plan.

#### 1.    Manner of Payment.

Under the Plan, any payment in Cash to be made by the Reorganized Debtor will be made at the election of the Reorganized Debtor, as applicable, by check drawn on a domestic bank or by wire transfer from a domestic bank, at times specified the Plan.

#### 2.    Funds and Accounts for Distribution and Plan Implementation.

The Plan provides that Reorganized Debtors will establish the Disputed Claims Reserve, the Plan Expense Reserve, and any other funds or accounts, that the Reorganized Debtors deem necessary or desirable to implement the Plan.

The Reorganized Debtors may establish a Plan Expense Reserve for the purpose of funding and implementing the Plan.  On the Effective Date, or as soon thereafter as reasonably practicable, the Reorganized Debtors may create a reserve for Plan expenses, including Litigation Costs necessary to adequately fund litigation which the Reorganized Debtors in their business judgment determine is likely to produce a recovery in excess of the costs of pursuing the Cause of Action, which will be called the Plan Expense Reserve.  They may also establish an Ad Valorem Tax Escrow for paying *ad valorem* taxes.  The Reorganized Debtors may transfer an appropriate amount of Cash into such plan accounts as the Reorganized Debtors deem necessary and desirable to fund pay Plan expenses and *ad valorem* taxes efficiently and promptly.

#### 3.    Distributions on Allowed Claims and Interests.

Distributions on Claims will be made in accordance with Article VI of the Plan.   The Reorganized Debtors will make no distribution to holders of Claims that are not Allowed Claims as defined in the Plan.  Notwithstanding any other provision of the Plan, the Reorganized Debtors will have discretion to make the distributions called for under the Plan at the times specified in the Plan, or earlier if the Reorganized Debtors deem such earlier distribution to be necessary or beneficial.  Please refer to Article VI of the Plan for more specific detail on payment and distributions with respect to particular Classes of Claims, including Allowed Claims as of the Effective Date, Disputed Claims, and Subsequently Allowed Claims.

#### 4.    Distributions on Unclassified, Non-Tax Priority, and Secured Claims.

The Plan generally provides that on the Effective Date, the Reorganized Debtors will pay to each of the holders of Allowed Administrative Claims, Allowed Priority Tax Claims (subject to the right to make deferred cash payments to such claimants in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code), and Non-Tax Priority Claims the amount provided in Article III of the Plan, unless such holder and the Debtors or the Reorganized Debtors, as the case may be, agree upon other, lesser terms for the treatment of such Claim. The Debtors estimate that all such claims should be paid in full.

The Plan provides, as more specifically set forth therein, that at the times of distribution to Allowed Claims, the Reorganized Debtors will cause a transfer to the Disputed Claims Reserve of the amount of Cash necessary to pay the amount due at such distribution to Disputed Claims related to the above, to be paid by the Reorganized Debtors from the Disputed Claim Reserve if and when such claim becomes an Allowed Claim.

For the purpose of setting aside the Disputed Claims Reserve as provided in the Plan, the Reorganized Debtors will, on account of such Disputed Claim, deposit into the Disputed Claims Reserve an amount equal to the distribution due to the holder of the Disputed Claim based upon the face amount of any Proof of Claim or request for payment of Administrative Claim filed by the holder of a Disputed Claim or, if no Proof of Claim or Request for Payment has been filed, the amount shown by any pleading asserting the claim, if no such pleading has been filed, the amount shown by Debtors' Schedules.

### 5. Distributions with respect to Other Classes

The Plan provides generally that Allowed Claims in certain Classes as listed above will be paid in full on the Effective Date.  Other Classes will not be paid in full.

The Reorganized Debtors will deposit into the Disputed Claims Reserve the distribution which would have been due to all holders of Disputed Claims in such Classes if they were Allowed Claims.

With respect to each Disputed Claim in such Classes, the Reorganized Debtors shall deposit into the Disputed Claims Reserve the distribution which would have been due to the holder of such Disputed Claims in such Classes as if they were Allowed Claims, as calculated in Section 6.4.1(a) of the Plan.

### 6. Previously Disputed Claims that Are Subsequently Allowed.

The Plan provides that within fifteen (15) days from the date of which any order of the Bankruptcy Court allowing a previously Disputed Claim becomes a Final Order, with no appeal pending, or if an appeal is filed, the date on which all orders affirming allowance of such claims becomes non-appealable, the Reorganized Debtors will withdraw from the Disputed Claims Reserve an amount equal to the amount deposited into the Disputed Claims Reserve on account of each previously Disputed Claim and will then pay the holder of such previously Disputed Claim the amount due on such Claim as of the date of such distribution to its Class.  No interest will be payable on account of any delayed distribution unless such interest is a distribution of Post-confirmation Interest specifically set forth in the Plan and payable for that Class.

In the event a Disputed Claim (including any interest) is finally Allowed in an amount less than the face amount of any Proof of Claim filed by the holder of such Disputed Claim or is subordinated or re-characterized, the Reorganized Debtors will recalculate the accumulated distribution to all holders of Allowed Claims in the affected Class using the formula specified in the Plan (described in the foregoing paragraph) and will likewise recalculate the accumulated distribution due to the holder of the previously Disputed Claim.  The dividend thus calculated to the holder of the previously Disputed Claim will thereupon be paid to the holder of such Claim.

37

For purposes of all subsequent distributions, the previously Disputed Claim will be treated as an Allowed Claim and included in the appropriate Class and will be paid accordingly with the rest of its Class.

### 7. Unclaimed Distributions.

Under the Plan, payment will be stopped on checks disbursed by the Reorganized Debtors to holders of Allowed Claims if such checks remain not cashed ninety (90) days after the date of disbursement. No further distribution shall be made under this Plan to the holder of any Allowed Claim who fails to negotiate a check issued by the Reorganized Debtor on account of a claim for payment within the ninety (90) days after the date such check was mailed to the holder, and any unclaimed distribution on account of such Allowed Claim shall thereby be deemed waived. Any distribution remaining unclaimed at the expiration of such ninety (90) day period shall become property of the Reorganized Debtor pursuant to section 347(b) of the Bankruptcy Code.

### 8. Rounding of Dividend Amounts.

The Plan provides that, notwithstanding any other provision of the Plan, the Reorganized Debtors will not be required to make any distribution of less than $10.00 to the holder of any Allowed Claim, and may round all distributions to the nearest $1.00.

### 9. No Interest or Attorneys' Fees.

Except as expressly stated in the Plan or as allowed by the Bankruptcy Court, no interest, penalty or late charge arising after the Petition Date, and no award or reimbursement of attorneys' fees or related expenses or disbursements arising after the Petition Date will be allowed on, or in connection with, any Claim. This provision will apply whether the distribution on such Claim is made on the Effective Date or thereafter.

### 10. Distributions to the Last Known Address.

Distributions to holders of Allowed Claims will be sent to the last known address set forth on such holder's Proof of Claim Filed with the Bankruptcy Court, or on the Schedules, if no proof of Claim has been filed. Holders of Claims may change the address to which Distributions, if any, will be sent by furnishing written notice to the Reorganized Debtor, in accordance with the notice provisions of the Plan. A proper notice of change of address will be effective for a distribution if received at least 30 days in advance of such distribution date.

### 11. Withholding or Other Taxes.

The Plan provides that the Debtors or the Reorganized Debtor, as the case may be, shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions under this Plan shall be subject to any such withholding and reporting requirements.

12.     Subordination Rights.

The Plan provides that all subordination rights, claims, and defenses of the Debtors and Reorganized Debtors, respectively, will remain valid, enforceable, and unimpaired in accordance with section 510 of the Bankruptcy Code or otherwise, except as otherwise specifically provided in the Plan.

**F.     Provisions Governing Objections to Claims.**

1.     Allowance of Claims.

Except as expressly provided in the Plan or any order entered in the Cases prior to the Effective Date (including the Confirmation Order), no Claim will be deemed Allowed unless and until such Claim is deemed Allowed under the Bankruptcy Code or agreed to be Allowed by the Debtors, by the Reorganized Debtors in accordance with the Plan, or so ordered by Final Order of the Bankruptcy Court.  Except as expressly provided in the Plan, the Reorganized Debtors after Confirmation will have and retain any and all rights and defenses the Tuckers had with respect to any Claims as of the Petition Date, including the Causes of Action referenced in the Plan and the Disclosure Statement and the Filing of any motions or other pleadings for estimation of the amount of Disputed Claims.  All Claims of any Person or Entity that owes money to the Tuckers will be disallowed unless and until such Person or Entity pays the full amount it owes the Debtors.

2.     Examination and Objections to Claims.

The Plan provides that following the Effective Date, the Reorganized Debtors shall examine all Claims not previously objected to by the Debtors and shall have the responsibility of filing objections to the allowance of such Claims and continuing prosecutions of objections to Claims filed prior to the Effective Date..

Except as otherwise specified in the Plan (including, without limitation, with respect to Administrative Claims, Fee Claims, and Cure Cost Claims), objections to Claims shall be Filed with the Bankruptcy Court and served upon Creditors by the Claims Objection Bar Date, which shall be no later than 120 days after the Effective Date or 90 days after such Claim is Filed, whichever date is later; provided, however, that this deadline may be extended by the Bankruptcy Court upon motion of the Reorganized Debtors, without notice or a hearing.  After an order, judgment, decree, or settlement agreement allowing a Disputed Claim becomes a Final Order, Distributions with respect to and on account of such previously Disputed Claim will be made on or before the time of the next scheduled distribution to holders of Allowed Claims in the Class in which the previously Disputed Claim is allowed.

3.     Claim Objection Resolution.

The Plan provides that objections to Claims may be litigated to judgment, settled, or withdrawn by the objecting party. The Plan provides that the Reorganized Debtors have authority to settle any Claim without any notice or approval of any other party, unless such settlement would result in a decrease to the distribution provided to any other Allowed Claim under the Plan, in which event such settlement and impact on Allowed Claims will be noticed as provided

under Bankruptcy Rule 9019, with a hearing to be conducted upon any objection filed pursuant to such notice.  Any settlement may be presented for approval to the Bankruptcy Court, upon the request of the Reorganized Debtors of the holder of the formerly disputed claim.

### 4.    No Distributions to Holders of Disputed Claims.

The Plan provides that notwithstanding any other provision of the Plan, no Distribution will be made on account of any Disputed Claim.

### 5.    Estimation of Claims.

Under the Plan, the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate any Claim pursuant to Section 502(c) of the Bankruptcy Code, as applicable, regardless of whether the Debtors or the Reorganized Debtors previously have objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during the litigation concerning any objection to any Claims, including, without limitation, during the pendency of any appeal relating to any such objection.  Subject to the provisions of Section 502(j) of the Bankruptcy Code, in the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, the amount so estimated shall constitute the Allowed amount of such Claim.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court

**G.    Provisions Regarding Effects of Confirmation.**

### 1.    Discharge of Reorganized Debtors.

**Under the Plan, the effects of Confirmation will be as provided under Bankruptcy Code Sections 1141(a), (b), (c), and (d) and 524(a).  The applicable Code sections provide, in relevant part:**

**§ 1141. Effect of confirmation**

**(a)** Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.

**(b)** Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.

**(c)** Except as provided in subsections (d)(2) and (d)(3) of this section and except as

40

otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor.

**(d)**

**(1)** Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan—

**(A)** discharges the debtor from any debt that arose before the date of such confirmation, and any debt of a kind specified in section 502 (g), 502 (h), or 502 (i) of this title, whether or not—

**(i)** a proof of the claim based on such debt is filed or deemed filed under section 501 of this title;

**(ii)** such claim is allowed under section 502 of this title; or

**(iii)** the holder of such claim has accepted the plan; and

**(B)** terminates all rights and interests of equity security holders and general partners provided for by the plan . . .

**(6)** Notwithstanding paragraph (1), the confirmation of a plan does not discharge a debtor that is a corporation from any debt—

**(A)** of a kind specified in paragraph (2)(A) or (2)(B) of section 523 (a) that is owed to a domestic governmental unit, or owed to a person as the result of an action filed under subchapter III of chapter 37 of title 31 or any similar State statute; or

**(B)** for a tax or customs duty with respect to which the debtor—

**(i)** made a fraudulent return; or

**(ii)** willfully attempted in any manner to evade or to defeat such tax or such customs duty.

### § 524 Effect of discharge

(a) A discharge in a case under this title--

(1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section 727, 944, 1141, 1228, or 1328 of this title, whether or not discharge of such debt is waived;

41

(2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived; and

(3) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect or recover from, or offset against, property of the debtor of the kind specified in section 541(a)(2) of this title that is acquired after the commencement of the case . . .

2.      Post-confirmation Effects of Evidences of Claims or Interests.

On the Effective Date, except as otherwise provided in the Plan, all notes, or evidences of indebtedness other than deeds to secure debt and security agreements creating liens in the Debtors' Assets, shall be novated into the Plan, and thereafter the Plan and any document issued in furtherance thereof shall govern the rights of the parties.

3.      Preservation of Causes of Action.

The Plan provides that upon the occurrence of the Effective Date, all Causes of Action of the Debtors and the Estates will be retained and preserved for enforcement by the Reorganized Debtors.  The Reorganized Debtors will have the power and right to commence or continue and otherwise enforce any Causes of Action of the Debtors and/or the Estates, all of which will be retained and preserved hereby, notwithstanding Confirmation or consummation of the Plan.

The Reorganized Debtors have or will be deemed to have all rights on behalf of the Debtors and/or the Estates to commence and pursue any and all Causes of Action (under any theory of law, including, without limitation, the Bankruptcy Code, and in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Cases) discovered in such an investigation, to the extent the Reorganized Debtors deem pursuit of such Cause of Action appropriate.  Potential Causes of Action currently being investigated by the Reorganized Debtors, which may, but need not be, pursued by the Debtors prior to the Effective Date and by the Reorganized Debtors after the Effective Date as warranted but which will be retained after Confirmation include, without limitation, the following:

(a)      Causes of Action.  The Plan provides that upon the occurrence of the Effective Date, all Causes of Action of the Debtors and the Estates will be retained and preserved for enforcement by the Reorganized Debtor.  The Plan provides that, in accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtor may pursue any claims or recovery actions held by the Debtors or the Estates, including without limitation recovery under sections 542, 544, 547, 548, and 549 of the Bankruptcy Code.  The recovery from any actions, after payment of legal fees and other expenses associated with the pursuit of such actions, shall be included in the calculation of Net Disposable Income.  The Reorganized Debtors may abandon any claim it has against any third party if it determines that such claim is burdensome or of inconsequential value and benefit.  The Reorganized Debtors are authorized to employ counsel and other professionals to represent it in the litigation or any causes of action or claims held by the Debtors or Estates.

(b)      Any and all other Claims and Causes of Action of the Debtor.  In addition, there may be other Causes of Action which currently exist or may subsequently arise that are not set forth in the Plan or Disclosure Statement because the facts upon which such Causes of Action are based are not currently or fully known by the Debtors and, as a result, cannot be raised during the pendency of the Chapter 11 Case (collectively, the "Unknown Causes of Action").  The failure to list any such Unknown Cause of Action herein or in other Plan documents is not intended to and will not limit the rights of the Reorganized Debtors to pursue any Unknown Cause of Action to the extent the facts underlying such Unknown Cause of Action subsequently become fully known to the Debtors or the Reorganized Debtors or other parties in interest.

The Plan provides that unless Causes of Action against a Person or Entity are expressly waived, relinquished, released, compromised, or settled in the Plan or by any Final Order, the Tuckers and Post-confirmation Debtors and Estates, on behalf of themselves and holders of Allowed Claims and in accordance with Bankruptcy Code Section 1123(b)(3)(B), expressly reserve and will retain for enforcement post-Confirmation and post-consummation all Causes of Action and Unknown Causes of Action, including, without limitation, the Causes of Action described in the Plan and Disclosure Statement, as well as any other Causes of Action or Unknown Causes of Action that the Debtors or the Estates had or had the power to assert immediately before Confirmation, for adjudication or later adjudication, and, therefore, no waiver or preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action upon or after the Confirmation or consummation of the Plan, solely due to such Confirmation or Consummation of the Plan.

In addition, under the Plan, the Debtors and the Estates expressly reserve and retain the right to pursue or adopt or otherwise enforce (and the right of the Reorganized Debtors to do so) any claims alleged in any lawsuit in which a Debtor is a defendant or an interested party, including, without limitation, the lawsuits described in the Disclosure Statement, against any Person, including, without limitation, the plaintiffs and co-defendants in such lawsuits.  Nothing contained in the Plan or Disclosure Statement or any related document will constitute a waiver of the rights, if any, of the Debtors or Estates or Reorganized Debtors, to a jury trial with respect to any Cause of Action or objection to any Claim or Interest.

4.      Continued Standing by Reorganized Debtors.

The Plan provides that, in accordance with Section 1123(b)(3) of the Bankruptcy Code, any Claims, rights, and Causes of Action that the Debtors, Reorganized Debtors, or Estates may hold or have the power to commence at any time against any Person or Entity will be preserved and retained and enforced by the Reorganized Debtors.  The Reorganized Debtors will have the right to continue or commence or otherwise enforce, as the authorized representative of the Debtors and the respective Estates, any and all such Claims, rights, or Causes of Action.  The Reorganized Debtors may pursue any and all such Claims, rights, or Causes of Action, as appropriate, in accordance with the best interests of the holders of Allowed Claims.  Subject to the provisions of the Plan, Reorganized Debtors will have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such Claims, rights, and Causes of Action.

5.        Exculpation and Limitation of Liability.

The Plan provides that TFF and the Reorganized Debtors, and each of their respective members, officers, directors, agents, attorneys, and employees (including Professionals) (collectively, the "Exculpated Persons") shall neither have nor incur any liability to any Person or Entity for any act taken or omitted to be taken by any Exculpated Person in connection with or related to the formulation, negotiation, preparation, dissemination, implementation, administration, Confirmation, or consummation of the Plan, the Disclosure Statement or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan (except for any obligations of the Reorganized Debtors or TFF arising in the ordinary course of business).  The Exculpated Persons shall have no liability to the Debtors, holder of a Claim, holder of an Interest, other party in interest in the Bankruptcy Case or any other Person for actions taken or not taken under the Plan, in connection herewith or with respect hereto, or arising out of their administration of the Plan or the property to be distributed under the Plan, including failure to obtain Confirmation of the Plan or to satisfy any condition or conditions, or refusal to waive any condition or conditions, to the occurrence of the Effective Date, and in all respects such Exculpated Persons shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan or with respect to the Bankruptcy Case.  Provided, however, that the foregoing provisions of this paragraph shall have no effect on the liability of any Exculpated Person that results from any such act or omission that is determined in a Final Order to have constituted fraud or other willful misconduct.

6.        Terms Binding.

The Plan provides that, upon the entry of the Confirmation Order, all provisions of the Plan, including all agreements, instruments and other documents filed in connection with the Plan and executed by the Debtors or the Reorganized Debtors in connection with the Plan, will be binding upon the Debtors, the Reorganized Debtors, all Claim and Equity Interest holders, TFF, and all other Persons that are affected in any manner by the Plan.  All agreements, instruments and other documents filed in connection with the Plan will have full force and effect, and will bind all parties thereto as of the entry of the Confirmation Order, whether or not such exhibits actually will be executed by parties other than the Debtors or the Reorganized Debtors, or will be issued, delivered or recorded on the Effective Date or thereafter.  All Pre-petition contracts, undertakings, and obligations of the Reorganized Debtors, other than to Holders of Claims in Classes that are unimpaired under the Plan, are deemed novated by the terms of the Plan.  No default shall be deemed to exist under any such novated obligations as of the Effective Date of the Plan, and notwithstanding the delay of discharge in this case, not holder of any claim may exercise any right upon default with respect to any Reorganized Debtor, the Remaining Properties, or otherwise until the occurrence of a default under the Plan.

7.        Continuation of Pre-Confirmation Injunction or Stays.

All injunctions or stays, whether by operation of law or by order of the Bankruptcy Court, provided for in the Bankruptcy Case pursuant to Sections 105, 362, and 525 of the Bankruptcy Code or otherwise that are in effect on the Confirmation Date or imposed by the Confirmation Order shall remain in full force and effect until the Final Decree.  Notwithstanding any administrative closing of the Cases or the entry of a Final Decree, the automatic bankruptcy

44

stay shall remain in effect with respect to the Individual Debtors until the Debtors are discharged at the conclusion of Plan payments, as provided under 11 U.S.C. § 1141(d)(5).

**H.     Retention of Jurisdiction.**

The Plan provides that notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date under the Plan, until such time as all payments and distributions required to be made and all other obligations required to be performed under the Plan have been made and performed by the Reorganized Debtors, the Bankruptcy Court will have and retain the maximum jurisdiction as is legally permissible , including, without limitation, jurisdiction over the Assets (including the Property and the Causes of Action), the Reorganized Debtors, and the Estate.  The Plan sets forth in more detail the jurisdiction to be retained by the Bankruptcy Court.

**I.     Miscellaneous Plan Provisions.**

1.     Modifications or Amendment.

The Plan provides that it may be modified or amended prior to Confirmation as allowed by the Bankruptcy Code or Rules.  Following Confirmation, amendments or modifications to the Plan may be made by a voting process similar to the voting process for acceptance of the Plan. These procedures are set out in detail in Article X of the Plan.

2.     Events of Default; Remedies Upon Default.

The Plan provides that the failure of the Reorganized Debtors to make any payment due under the Plan when due, and the failure of the Reorganized Debtors to cure such monetary default within twenty-one (21) days after written notice (as provided in Section 10.10 of the Plan) to the Reorganized Debtors of such default, shall constitute a default under the Plan.  Such written notices shall be given to the Reorganized Debtors.  Any "default," as defined in Section 10.3 of the Plan, shall entitle the holder of Allowed Claims or Interests affected thereby to the remedies provided under the Bankruptcy Code and under any promissory note issued pursuant to the Plan, or under any recorded deed to secure debt issued or continuing under the terms of the Plan.  Any suit in law or in equity to enforce the rights and remedies under the Plan may be brought only in either the Bankruptcy Court or in the Superior Court of Berrien County, Georgia.

3.     Exemption from Transfer Taxes.

The Plan provides that, pursuant to section 1146(a) of the Bankruptcy Code, the Confirmation Order, and any sale orders entered in the Bankruptcy Case, the transfer or making or delivery of any instrument whatsoever in furtherance of or in connection with the Plan, including, without limitation, any transfer of the Farm Assets (including without limitation transfer of Assets to the Reorganized Debtor), subsequent transfers to creditors or purchaser(s), and any assignments, documents, instruments and agreements and other conveyance documents executed and delivered by the Reorganized Debtor in connection with the implementation of the Plan or otherwise, shall not be subject to any stamp, real estate transfer, personal property, recording or other similar tax.

4.      Effectuating Documents, Further Transactions and Corporate Action.

The Reorganized Debtor, all holders of Allowed Claims receiving Distributions under the Plan, and all other parties in interest will, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

5.      Successors and Assigns.

The rights, benefits and obligations of any Person or Entity named or referred to in the Plan will be binding on, and will inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Entities.

6.      Governing Law.

Except to the extent that the Bankruptcy Code is applicable, the rights and obligations arising under the Plan and Disclosure Statement will be governed by and construed and enforced in accordance with the laws of the State of Georgia.

7.      Conflicts.

As provided in the Plan, to the extent any provision of the Disclosure Statement, and any documents executed in connection with the Confirmation Order (or any exhibits, schedules, appendices, supplements or amendments to the foregoing) conflicts with or is in any way inconsistent with the terms of the Plan, the terms and provisions of the Plan will govern and control.

8.      Severability of Plan Provisions

The Plan provides that if any provision of the Plan is determined to be unenforceable in whole or in part, either facially or as applied, such determination shall in no way limit or affect the enforceability or operative effect of any other provision of the Plan or require the re-solicitation of any acceptance or rejection of the Plan, unless, in the absence of such provision, the Plan would fail of its essential purpose, as determined by the Bankruptcy Court.  Upon such a finding, the Debtors' period of exclusivity within which it has the exclusive right to file an amended plan shall be reinstated for a period of 60 days from the date such a finding becomes a Final Order, and the Debtors' period of exclusivity for solicitation of acceptances shall be enlarged for 105 days from the date such a finding becomes a Final Order.

## VI.    **FINANCIAL INFORMATION**

The Debtors have filed theirs Schedules with the Bankruptcy Court as required by the Bankruptcy Code.  The Debtors will supplement and amend their Schedules as necessary and appropriate from time to time.  This financial information has not been included in this Disclosure Statement, but may be examined at the Clerk's Office, United States Bankruptcy Court, Middle District of Georgia, 901 Front Avenue, One Arsenal Place, Columbus, Georgia, or online through PACER©.

The Reorganized Debtor will file post-confirmation quarterly operating reports after the Effective Date through the earlier of the entry of a Final Decree or court Order excusing further filings(i.e., via the administrative closing of the Cases pending completion of all Plan Payments). The Debtors previous and subsequent monthly operating reports are on file with the Court, and may be examined at the Clerk's Office, United States Bankruptcy Court, Middle District of Georgia, 901 Front Avenue, One Arsenal Place, Columbus, Georgia, or online through PACER©.

## VII.   ACCEPTANCE AND CONFIRMATION

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of Section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation of a plan are that (i) the plan is accepted by all impaired classes of Claims and Interests or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) the plan is feasible, and (iii) the plan is in the "best interests" of creditors and holders of Claims and Interests impaired under the plan.

### A.     Acceptance of the Plan.

In order for an Impaired Class of Claims or Interests to accept the Plan, (a) the holders (other than any holder designated under Section 1126(e) of the Bankruptcy Code) of at least two-thirds (2/3) in amount of the Allowed Claims or number of Interests actually voting in such Class must have voted to accept the Plan and, with respect to Claims only, (b) the holders (other than any holder designated under Section 1126(e) of the Bankruptcy Code) of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

Holders of Claims in Impaired Classes are entitled to vote to accept or reject the Plan.

The Plan provides that the Plan will constitute a request that the Bankruptcy Court confirm the Plan over such rejection in accordance with section 1129(b) of the Bankruptcy Code, the so-called "cram down" provision.  The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or the Disclosure Statement, including any exhibit or attachment, if necessary to satisfy the requirements of Section 1129(b) of the Bankruptcy Code.

### B.     Feasibility.

As a condition to confirmation of the Plan, Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the Plan is not likely to be followed by the liquidation of the Reorganized Debtors unless such liquidation is proposed in the Plan.  This requirement is addressed further in Section VIII, below.

### C.      "Best Interests of Creditors" Test.

Confirmation of the Plan also requires that each claimant either (i) accept the Plan or (ii) under the Plan, and pursuant to Section 1129(a)(7) of the Bankruptcy Code, receive or retain property with a value, as of the Effective Date, that is not less than the value such claimant

would receive or retain if the Debtors' assets were liquidated under Chapter 7 of the Bankruptcy Code.

Under the Plan, all Classes of Claims, except Unclassified Claims, are impaired and must vote to accept the Plan.  The payments proposed under the Plan will propose a dividend in excess of what could be expected if Debtors' assets were "liquidated under Chapter 7."  **Exhibit F**, attached hereto, represents the Debtors' projection of the liquidation value of their assets under Chapter 7 on a per Debtor basis.  In order to understand the projection which follows, a short discussion of the priorities in payment of claim established by the Bankruptcy Code is in order.

In a Chapter 7 bankruptcy case, a Chapter 7 trustee administers all assets of the debtor.  The Chapter 7 trustee investigates each asset of the debtor to determine whether the asset has sufficient value to produce "equity" for general creditors.  "Equity" is generally defined as an asset's realizable liquidation value significantly in excess of the aggregate amount of all claims secured by that asset.  A Chapter 7 trustee's commissions, and expenses of liquidation and professional fees, further reduce the "Equity."  If a Chapter 7 trustee concludes that there is no "Equity" in any particular asset, then the asset is usually "abandoned."  If a Chapter 7 trustee concludes that an asset does have potential to produce "Equity," then the asset is liquidated, the secured liens against the asset are paid off, the trustee recovers his costs of administering and liquidating the asset, and any remaining proceeds are placed in a general fund for distribution to creditors in accordance with the priority scheme of the Bankruptcy Code.

Therefore, under the distribution scheme of Chapter 7 of the Bankruptcy Code, secured creditors must be paid in full from the proceeds of its collateral.  Only the "Equity" portion of the collateral, if any, is available for Unsecured Creditors.

Once a "fund" for distribution to Creditors is established, a Chapter 7 trustee must pay claims in the order of their statutory priority under Section 507 of the Bankruptcy Code.  Secured Claims and Priority Claims are entitled to payment in full before Unsecured Creditors are entitled to distribution.

If the Cases were converted to a Chapter 7, then all Chapter 11 administrative expenses would be entitled to payment ahead of unsecured claims, but after the expenses of the Chapter 7 administration and a Chapter 7 trustee's professional fees.  Chapter 11 administrative expenses will include any outstanding trade debt incurred since April 19, 2018, but unpaid as of the date of any liquidation, and unpaid Professional compensation and any administrative taxes due.

In a Chapter 7 liquidation, all assets will be sold by a commissioned trustee, or abandoned to secured creditors.  The Debtors believe that in a Chapter 7 liquidation the trustee would cause a "fire sale" liquidation.  A Chapter 7 trustee could also abandon the estate's interest in the Debtors' Property, and allow the Senior Secured Lender to foreclose.  The Debtors believe that the Plan is more favorable than Chapter 7 liquidation because the Plan provides for a higher payment to creditors than they would likely receive in a liquidation.

**Chapter 7 Liquidation Analysis**

The chart attached hereto as **Exhibit F** assumes that, if the Cases were converted to Chapter 7, then the Chapter 7 trustee would liquidate Debtors' assets (both Farm Assets and personal household assets) at an auction sale.  **Exhibit F** represents the Debtors' projection of the **net liquidation value** of their assets under Chapter 7 on a per Debtor basis.  **Exhibit F** shows the following liquidation values:

| | |
|---|---|
| Farm Assets: | $302,170.12 |
| Ricky Tucker: | $79,894.63 |
| Clay Tucker: | $14,104.59 |
| Chapter 7 Expenses: | ($230,146.99) |

**Combined Net Liquidation Value:         $166,032.35**

Under the Plan, Debtors, propose to pay unsecured creditors at least $172,741.99 over 5 years, together with Plan Interest.

THEREFORE, FOR THE FOREGOING REASONS, THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF EACH CLASS OF CREDITORS AND THAT EVERY IMPAIRED CLASS WILL RECEIVE DISTRIBUTIONS UNDER THE PLAN WHICH ARE GREATER THAN THE DISTRIBUTIONS SUCH CLASSES WOULD RECEIVE IN A CHAPTER 7 LIQUIDATION OF THE DEBTORS.

## VIII.   FEASIBILITY OF THE PLAN

The Tuckers' (through operation of TFF) financial projections are attached hereto as **Exhibit D** (the "Projections" or "Budgets").  The Projections show sufficient cash flows to make the payments on all Allowed Claims in each Class, as called for in the Plan.  Certain assumptions made in connection with Projections, which the Debtors suggest are conservative, are itemized on the **Exhibit D**.  Because the projections are based on averages, the actual results will probably vary from the projection, but the projection should be substantially accurate over its term.  There will be no event of default under the Plan if the Tuckers fail to meet their projected revenues or generate the projected cash flows in a given year.

Because the Tuckers operate a farm and their cash flows are subject to wide variance due to unforeseen circumstances such as weather and commodity pricing, the Plan provides for a one time, one year moratorium on any payment to any Allowed Claim in any Class in any year in which TFF and Debtors combined income is insufficient to make such payments (the "Payment Deferral"). In any year in which the Reorganized Debtors choose to exercise the Payment Deferral with respect to a given Class, such scheduled payment shall be added to the end of the payment term provided under the Plan, with regularly scheduled payments to resume the following year.

The Debtors believe the Plan is fair and equitable, and provides the best potential for payment of the claims of creditors.

## IX.    CERTAIN TAX CONSEQUENCES

The confirmation and execution of the Plan may have tax consequences to holders of Claims and interests, as well as to the Debtors.

***Creditors and Equity Interest holders concerned with how the Plan may affect their tax liability should consult with their own accountants, attorneys, and/or advisors.***

### A.    In General.

The federal income tax consequences of the implementation of the Plan to a Creditor will depend in part on (a) whether the Creditor's Claim constitutes a security for federal income tax purposes, (b) whether the Creditor reports income on the accrual basis, (c) whether the Creditor receives consideration in more than one (1) tax year, and (d) whether all the consideration received by the Creditor is deemed to be received by that Creditor as part of an integrated transaction.  The federal tax consequences upon the receipt of cash and notes allocable to interest are discussed in "Receipt of Interest" below.

### B.    Gain or Loss on Exchange.

While the Debtors do not believe that any of their trade creditor's Claims will constitute tax securities, certain of its long-term obligations could be classified as tax securities.  Whether a debt instrument constitutes a security is based on the facts and circumstances surrounding the origin and nature of the debt and its maturity date.  Generally, claims arising out of the extension of trade credit have been held not to be securities.  Instruments with a five-year term or less rarely constitute securities.  Accordingly, a Creditor will recognize gain or loss on the exchange of his existing Claim (other than a Claim for accrued interest) for any consideration.  The amount of such gain or loss will equal the difference between (a) the "amount realized" in respect of such Claim and (b) the adjusted tax basis of the Creditor in such Claim.  Pursuant to Section 1001 of the Internal Revenue Code, the "amount realized" will be equal to the sum of the cash plus the fair market value of any other property received in such exchange.

(a)    Receipt of Cash.

A Creditor who received cash in full satisfaction of his claim will be required to recognize gain or loss on the exchange.  The Creditor will recognize gain or loss equal to the difference between the "amount realized" in respect of such Claim and the adjusted tax basis of the Creditor in the Claim, and the tax treatment of the exchange will parallel the tax treatment set forth under "Gain or Loss on Exchange" above.

(b)    Determination of Character of Gain or Loss.

In the case of a Creditor whose existing Claim does not constitute a capital asset, the gain or loss realized on the exchange will give rise to ordinary income or loss.  In the case of a Creditor whose existing Claim does constitute a capital asset in his hands, the gain or loss required to be recognized will generally be classified as a capital gain or loss, except to the extent of interest.  Any capital gain or loss recognized by a Creditor will be long-term capital

gain or loss with respect to those Claims for which the holding period of the Creditor is more than twelve (12) months, and short-term capital gain or loss with respect to such Claims for which the holding period of the Creditor is twelve (12) months or less.

        (c)     Receipt of Interest.

The Bankruptcy Tax Act of 1980 reversed prior law by providing that consideration attributable to accrued but unpaid interest will be treated as ordinary income, regardless of whether the Creditor's existing Claims are capital assets in his hands and the exchange is pursuant to tax reorganization.  A Creditor who, under his accounting method, was not previously required to include income accrued, but unpaid interest attributable to his existing Claims, and who exchanges his interest Claim for Cash, other property or Stock, or a combination thereof, pursuant to the Plan will be treated as receiving ordinary interest income to the extent of any consideration so received allocable to such interest, regardless of whether that Creditor realizes an overall gain or loss as a result of the exchange of his Claims.

        (d)     Backup Withholding.

Under the Internal Revenue Code, interest, dividends and other "reportable payments" may, under certain circumstances, be subject to "backup withholding" at the then applicable rate. Withholding generally applies if the holder:  (i) fails to furnish his social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails to report interest or dividends or (iv) under certain circumstances fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is his correct number and that he is not subject to backup withholding.

        (e)     <u>Cancellation of Debt ("COD") Income</u>

Cancellation of debt income (or COD income) arises when a debtor does not repay the full amount of a debt.  The general rule is that the amount of COD income equals the excess of the face amount of the debt over the amount paid to discharge it.

IRC section 108(a)(1)(A) provides that there is excluded from gross income of a taxpayer the amount realized from COD income if the discharge occurs in a title 11 case.

BECAUSE THE FINAL OUTCOME DEPENDS SO MUCH ON EACH INDIVIDUAL CREDITOR'S OR INTEREST HOLDER'S SITUATION, IT IS IMPERATIVE THAT EACH CREDITOR OR INTEREST HOLDER SEEK INDIVIDUAL TAX COUNSEL FOR ADVICE ON ITS PARTICULAR SITUATION.

ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO ANY FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.  THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS LEGAL OR TAX ADVICE TO ANY CREDITOR OR INTEREST HOLDER.

## X.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN

If the Plan is not confirmed and consummated, the alternatives include (a) liquidation of the Debtors under Chapter 7 of the Bankruptcy Code or (b) an alternative plan of reorganization. The Debtors believe that if the Plan is not confirmed, holders of Allowed Claims will receive a smaller dividend than proposed under the Plan.

### A.    Liquidation Under Chapter 7.

If no plan can be confirmed, the Cases may be converted to cases under Chapter 7 of the Bankruptcy Code.   In each Case, a Chapter 7 trustee would be appointed to liquidate the remaining assets of the respective Debtor for distribution to its creditors in accordance with the priorities established by the Bankruptcy Code.   These Chapter 7 trustees would need time to investigate the respective Debtors' pre-petition transactions, and their assets and liabilities.   The Chapter 7 trustees would retain and liquidate the Tuckers' remaining assets, and, if necessary, investigate and pursue Causes of Action.   The liquidation of the Tuckers' assets would result in distressed recoveries and would therefore reduce significantly the recovery to Unsecured Creditors.   The Tuckers also believe that the conversion of the Cases to a Chapter 7 of the Bankruptcy Code and the appointment of two Chapter 7 trustees would increase the costs of administration, and reduce and postpone any distribution to holders of Allowed Claims.

For all of the foregoing reasons, the Debtors have concluded that Creditors are likely to receive an amount under the Plan that is substantially greater than the amount such Creditors would receive under a chapter 7 liquidation.

### B.    Alternative Plan of Reorganization.

If the Plan is not confirmed, the Debtors, or any other party-in-interest could attempt to formulate a different plan.   The Debtors believe that the Plan described herein enables the Creditors and all parties-in-interest to realize the best payout under the circumstances.

## XI.    SOLICITATION

The Disclosure Statement you are reading is submitted by the Tuckers in compliance with its obligations under the Bankruptcy Code to provide "adequate information" to enable you to reach an informed decision regarding whether it is in your best interest to vote to accept the Tuckers' Plan.   All Claims are to receive the maximum distribution possible under the circumstances at a much earlier date than distributions would be paid if the Cases were converted to a Chapter 7 case.

The Tuckers urge all holders of claims and interests to carefully consider the Plan of Reorganization and complete the attached Ballot accepting the Plan.

The Tuckers, along with their families, thank you, in advance, for your support.

IN WITNESS WHEREOF, the undersigned have caused this Disclosure Statement to be duly executed as of the date written below.

This 27th day of November, 2018.

**RICKY WAYNE TUCKER**

/s/ Ricky Wayne Tucker

**RICKY CLAY TUCKER**

/s/ Ricky Clay Tucker

**STONE & BAXTER, LLP**
**By:**

/s/ G. Daniel Taylor
David L. Bury, Jr.
Georgia Bar No. 133066
Matthew S. Cathey
Georgia Bar No. 759547
G. Daniel Taylor
Georgia Bar No. 528521
Suite 800, Fickling & Co. Building
577 Mulberry Street
Macon, Georgia 31201
(478) 750-9898; (478) 750-9899 (fax)
dbury@stoneandbaxter.com
mcathey@stoneandbaxter.com
dtaylor@stoneandbaxter.com

Counsel for Debtors

G:\CLIENTS\Tucker, Ricky v. Chapter 11\Chapter 11 Plan\Disclosure Statement.doc